[No. A046379. First Dist., Div. One. July 18, 1991.]

MICHAEL J. WELLER et al., Plaintiffs and Respondents, v.
AMERICAN BROADCASTING COMPANIES, INC. et al., Defendants
and Appellants.

996

## COUNSEL

Morrison & Foerster, Linda E. Shostak, Paul Flum, Maia Ettinger and Judith M. Schelly for Defendants and Appellants.

Charles O. Morgan, Jr., and Paul Kleven for Plaintiffs and Respondents.

## OPINION

**STEIN, J.**—American Broadcasting Companies, Inc., KGO-TV, and Carol Ivy (appellants) appeal from a judgment entered against them in a defamation action brought by Michael J. Weller (Weller), Edgar W. Morse, and Argentum Antiques Ltd., Inc. (Argentum). The jury found that a series of broadcasts in February and March of 1984 concerning the origin and value of certain antique silver candelabra that Weller sold to the de Young Museum were defamatory and awarded damages totalling $2.3 million.

### FACTS

In 1982, Weller learned that a wealthy woman, from a well-established Texas family, wished to dispose of two rare candelabra made by the renowned silversmith, Paul Storr. Weller entered into a standard consignment agreement with the owner, agreeing to pay the owner $45,000 upon the sale of the candelabra. The owner asked that her identity be kept confidential, a request that was not uncommon in the antique silver industry.

Weller had a silversmith perform some repairs on the candelabra, which included filling in and touching up holes which had been drilled when the candelabra had once been electrified. Weller valued the candelabra at between $60,000 and $100,000.

For approximately nine months Weller unsuccessfully marketed the candelabra at an asking price of $90,000. In January of 1983, the de Young Museum purchased the candelabra for $65,000. At the time of purchase,

Weller advised the museum of the prior electrification and of other defects in the candelabra. Weller did not disclose the name of the former owner, but did provide the museum with a letter stating that the candelabra had been in private ownership in this country for "at least forty years."

Approximately one year later, KGO-TV's assistant news director, Andrew Shinnick, received a telephone call from a confidential source about the candelabra. The caller suggested that the museum might have paid too much for the candelabra, particularly in light of the electrification and repairs. The caller also stated that Barbara Herbert, a well-known San Francisco sculptress who had died some years earlier, might have owned a pair of candelabra similar to the ones at the museum.

Appellants aired a series of broadcasts that respondents contend implied the following defamatory facts: "that [respondents] sold stolen candelabra to the Museum; sold the candelabra at a grossly inflated price; misrepresented the maker, condition, origin and provenance of the candelabra to the Museum; were associates of Jerry Durham, a man recently convicted of insurance fraud involving silver who was suspected of having stolen the candelabra; inadequately repaired the candelabra; refused to cooperate with [appellants] in establishing the background of the candelabra; and generally defrauded the Museum."[1]

The jury returned a general verdict that appellants were liable to Weller and awarded general damages in the amount of $1 million for mental suffering, $500,000 for proven injury to reputation and $500,000 for presumed damages to reputation. It awarded no punitive damages.

In answers to special interrogatories, the jury specifically found that the average viewer would have understood the broadcasts to make one or more defamatory statements of fact about Weller and that the implied statements were substantially false. The jury also found that the retraction was not legally sufficient or effective. The jury further found that Ivy, ABC and KGO-TV were negligent in making those broadcasts. Although the jury agreed with the defense that the defamatory statements were privileged under former Civil Code section 47, subdivision 3 (now Civ. Code, § 47, subd. (c))[2] the jury found that the defendants acted out of the kind of malice

---

[1]The complete transcript of the broadcasts is set forth in the appendix to this opinion. The first broadcast was preceded by a report captioned, "Antique Fraud." This report covered the felony conviction of one Jerry Durham for making false insurance claims for stolen silver. The report regarding the de Young candelabra was captioned, "Museum Fraud?"

[2]After the trial, our Supreme Court held that former Civil Code section 47, subdivision 3 does not apply to media publication of defamatory facts about private persons simply because

necessary to defeat this privilege. The jury also found that Weller had proved by clear and convincing evidence that defendant Ivy made one or more of the defamatory statements "with knowledge that such statement was false or with a reckless disregard for the truth," but that they had not acted with the kind of malice warranting imposition of punitive damages. The jury also awarded Argentum Antiques $300,000 for proven injury to reputation and made similar findings in its answers to special interrogatories.

ANALYSIS

I.

CONSTITUTIONAL PRIVILEGE

Appellants initially contended that the trial court erred in denying their motion *in limine* to have evidence of 25 specific statements excluded because they constituted "opinion" and were therefore privileged as a matter of federal constitutional law. Their argument was based on the distinction between fact and opinion that both the lower federal courts (see, e.g., *Ollman v. Evans* (D.C.Cir. 1984) 750 F.2d 970 [242 App.D.C. 301] (en banc)) and the California courts (see, e.g., *Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 259-260 [228 Cal.Rptr. 206, 721 P.2d 87]) have attempted to define, with widely divergent results. (See, *Fact and Opinion in Defamation: Recognizing the Formative Power of Context* (1990) 58 Fordham L.Rev. 761, 769-770, fn. 52.) However, the United States Supreme Court has recently rejected the contention that a separate constitutional privilege exists to protect statements of opinion. (*Milkovich v. Lorain Journal Co.* (1990) 497 U.S. ___ [111 L.Ed.2d 1, 110 S.Ct. 2695].)[3] The court pointed out that expressions of "opinion" "may often imply an assertion of objective fact." For example, "[i]f a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." (*Id.* at pp. ___-___ [111 L.Ed.2d at pp. 17-18, 110 S.Ct. at pp. 2705-2706].)

The precise impact of the *Milkovich* decision on the viability of prior law distinguishing between fact and opinion remains to be seen. ( Compare *Unelko Corp. v. Rooney* (9th Cir. 1990) 912 F.2d 1049, 1053 [pre-*Milkovich*

the publication concerns a matter of "public interest." (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711 [257 Cal.Rptr. 708, 771 P.2d 406].)

[3]Since the parties assume that *Milkovich* applies to this case, we are not called upon to decide whether the decision is effective retroactively.

decisions developing the distinction between fact and opinion "have all been effectively overruled" by *Milkovich*] with *The Supreme Court—Leading Cases, 1989 Term* (1990) 104 Harv.L.Rev. 129, 219 ["Because the criteria used by lower courts . . . to distinguish fact from opinion are consistent with *Milkovich*'s limitations, the law of defamation will remain essentially the same."].) We have observed a tendency in the post-*Milkovich* decisions more often to find that allegedly defamatory statements fall outside the scope of constitutional protection. (See, e.g., *Unelko Corp.* v. *Rooney, supra*, 912 F.2d at p. 1053; *White* v. *Fraternal Order of Police* (D.C. Cir. 1990) 909 F.2d 512, 522-523 [285 App.D.C. 273]; *Scheidler* v. *National Organization for Women, Inc.* (N.D.Ill., E.D. 1990) 751 F. Supp. 743.) Nonetheless, as sanctioned by *Milkovich*, the courts are still willing to protect statements that are clearly satirical, hyperbolic, imaginative or rhetorical. (See, e.g., *Moyer* v. *Amador Valley J. Union High School Dist.* (1990) 225 Cal.App.3d 720 [275 Cal.Rptr. 494].) Statements of fact that are not provably false also continue to be protected. (See *Don King Productions, Inc.* v. *Douglas* (S.D.N.Y. 1990) 742 F.Supp. 778, 782.)

Although *Milkovich* disposes of appellants' argument that the broadcasts were absolutely privileged as statements of opinion, our analysis does not end here. (See, e.g, *Moyer* v. *Amador Valley J. Union High School Dist., supra*, 225 Cal.App.3d at p. 724; *Gill* v. *Hughes* (1991) 227 Cal.App.3d 1299, 1309 [278 Cal.Rptr. 306].) The *Milkovich* court explained that even without such a privilege, "the breathing space which freedoms of expression require in order to survive . . . is adequately secured by existing constitutional doctrine . . . ." (*Milkovich* v. *Lorain Journal Co., supra*, 497 U.S. at p. __ [111 L.Ed.2d at p. 18, 110 S.Ct. at p. 2706], citations and internal quotation marks omitted.) First, and "foremost," the court noted that its decision in *Philadelphia Newspapers, Inc.* v. *Hepps* (1986) 475 U.S. 767 [89 L.Ed.2d 783, 106 S.Ct. 1558] requires that "a statement on matters of public concern must be provable as false." (*Milkovich, supra*, at p. __ [111 L.Ed.2d at p. 18, 110 S.Ct. at p. 2706].) Thus, a "statement of opinion relating to matters of public concern which does not contain *a provably false* factual connotation will receive full constitutional protection." (*Milkovich, supra*, at p. __ [111 L.Ed.2d at p. 18, 110 S.Ct. at p. 2706], italics added.) Second, "the *Bresler* [4] *Letter Carriers* [5] *Falwell* [6] line of cases provide protection for statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual," (*Milkovich, supra*, at p. __ [111 L.Ed.2d at p. 19, 110 S.Ct. at p. 2706]) because it is expressed in loose figurative or hyperbolic language, and/or the context and tenor of the statements negate the im-

[4]*Greenbelt Pub. Assn.* v. *Bresler* (1970) 398 U.S. 6 [26 L.Ed.2d 6, 90 S.Ct. 1537].

[5]*Old Dominion Branch No. 496, etc.* v. *Austin* (1974) 418 U.S. 264 [41 L.Ed.2d 745, 94 S.Ct. 2770].

[6]*Hustler Magazine* v. *Falwell* (1988) 485 U.S. 46 [99 L.Ed.2d 41, 108 S.Ct. 876].

pression that the author seriously is maintaining an assertion of actual fact. In addition to the foregoing protections, the court emphasized that if the alleged defamatory statements are submitted to a jury, the culpability requirements imposed under *New York Times Co. v. Sullivan* (1964) 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412], *Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct. 2997], and *Curtis Publishing Co. v. Butts* (1967) 388 U.S. 130 [18 L.Ed.2d 1094, 87 S.Ct. 1975], provided additional protection for the exercise of First Amendment rights. (*Milkovich, supra*, at pp. __-__ [111 L.Ed.2d at pp. 19-20, 110 S.Ct. at pp. 2706-2707].)

Thus, even after *Milkovich*, under existing federal constitutional law, we must determine whether the statements that form the basis of a defamation claim: (1) expressly or impliedly assert a fact that is susceptible to being proved false; and (2) whether the language and tenor is such that it cannot " 'reasonably [be] interpreted as stating actual facts.' " (*Milkovich v. Lorain Journal Co., supra*, 497 U.S. at pp. __-__ [111 L.Ed.2d at p. 19, 110 S.Ct. at p. 2706]; *Gill v. Hughes* (1991) 227 Cal.App.3d 1299, 1309 [278 Cal.Rptr. 306].)[7]

 Applying the standards set forth in *Milkovich*, appellants now contend that significant portions of the broadcasts should have been excluded from the jury's consideration because: (1) no reasonable juror could conclude that the broadcasts implied the defamatory assertions respondents alleged they implied;[8] (2) the context and tenor of the broadcasts negated any impression that they were conveying actual facts because the listener was repeatedly cautioned against

[7]In our recent decision *Moyer v. Amador Valley J. Union High School Dist., supra*, 225 Cal.App.3d 720, we stated that "*Milkovich* does not change substantive law in this area." One court has interpreted that language as a broad statement that all prior law protecting statements labeled as opinion continues to survive *Milkovich*. (See *Kimura v. Superior Court* (1991) 230 Cal.App.3d 1235 [281 Cal.Rptr. 691].) Our statement, in context, stood only for the more narrow proposition that, because the *Milkovich* court reaffirmed its *Bresler-Letter Carriers-Falwell* line of decisions, statements that are clearly satirical, rhetorical or hyperbolic, continue to be protected. (*Moyer, supra*, at pp. 724-725.) At the same time, we emphasized that after *Milkovich* "a false assertion of fact could be libelous even though couched in terms of opinion." (*Moyer, supra*, at p. 723.)

[8]The question whether the broadcasts could be understood as *implying* defamatory statements is not an issue of constitutional law under *Milkovich*. Independent of any constitutional requirements, if a defamation claim is based on allegations of *implied* defamatory facts, the court must make a threshold preliminary determination whether the published statements could be understood as implying the alleged defamatory content. If the statements are susceptible of both an innocent and libelous meaning, it is for the jury to decide how they were in fact understood. (*Forsher v. Bugliosi* (1980) 26 Cal.3d 792, 803 [163 Cal.Rptr. 628, 608 P.2d 716].) This threshold determination is based on the common law principle that if a statement, innocent on its face, cannot be understood as implying defamatory facts, then it may not be the basis of a defamation cause of action. (*Ibid.*)

drawing any conclusions, and much of the language was loose, figurative or hyperbolic; and (3) assertions regarding the value and origin of the candelabra were not verifiable, and therefore were not provably false.[9]

### 1. *The Broadcasts Could Be Understood as Implying Defamatory Statements*

■ There is no question that the news reports in this case could have been understood as implying that Weller had, at worst, knowingly sold stolen property to the de Young Museum and, at best, had lied about the Texas origin and had sold them at a "grossly inflated price." This implication is conveyed by the persistent efforts to tie Jerry Durham, a convicted felon, to the transaction or at least to Weller; the suggestions that Durham had looted Herbert's art collection; the juxtaposition of the first report of the "Antique Fraud" of which Durham had been convicted, with the "Museum Fraud?" the station was investigating; the description of Barbara Herbert as the woman "we think owned the candelabra"; the addition of the, incidentally incorrect, piece of information that Weller's shop was only a block from Herbert's house; the suggestion of confidence in Lonnie Williams, the only person who positively identified the candelabra as belonging to Herbert; and the broadcast describing Weller as "reportedly" out of town in a manner that could be understood as suggesting that Weller was avoiding publicity and had a guilty conscience. In addition, Ivy's persistent suggestion that the museum was "stonewalling" her by not permitting her to film the candelabra, and that Weller and his lawyers were doing the same by refusing to disclose the name of the Texan former owner, all combined to create an atmosphere of shady dealing and the suggestion that Weller and the de Young Museum had something to hide.

The implication that Weller sold the candelabra at a "grossly inflated price" was even less subtle. The broadcasts expressly raised the possibility and devoted much time to the presentation of an expert's statement supporting that allegation. Moreover, Van Amburg's statement that Ivy had

---

[9]The California courts have consistently held that the determination whether a statement constitutes "fact" or "opinion" under pre-*Milkovich* law is an issue of law for the court to decide. (See *Baker* v. *Los Angeles Herald Examiner, supra*, 42 Cal.3d at p. 260.) The same is true for the "overwhelming weight" of federal authority. (*Ollman* v. *Evans, supra*, 750 F.2d at p. 978.) The principle behind this rule was that the "opinion privilege" derived from the First Amendment and that the United States Supreme Court has ruled that other privileges derived from the First Amendment are to be decided as a matter of law. (*Ibid.*; see also *Hoffman Co.* v. *E. I. Du Pont de Nemours & Co.* (1988) 202 Cal.App.3d 390, 397-398 [248 Cal.Rptr. 384].) This principle still applies to the post-*Milkovich* analysis whether statements contain provably false factual assertions and whether they would reasonably be understood as assertions of fact as opposed to hyperbole, or loose figurative expression. (*Moyer* v. *Amador Valley J. Union High School Dist., supra*, 225 Cal.App.3d at pp. 724-725.)

further reports on "what appears to be a sweetheart deal," and Ivy's rejoinder, "Van, it does look that way," reinforced the impression that appellants endorsed the conclusion that the candelabra were not worth what the museum paid for them, and that Weller had cheated the museum.

Appellants' contention that the average viewer might nonetheless have understood the broadcasts as casting no aspersions on Weller's conduct because of the repeated qualifications stating that the station was merely posing the question and that there were conflicting stories, misses the point: If the broadcasts could reasonably have been understood as implying the defamatory statements upon which respondents based their claim, but also could have been understood in an innocent sense, the jury must decide in what manner the broadcasts were ultimately understood. (*Forsher* v. *Bugliosi, supra*, 26 Cal.3d at p. 803.) The broadcasts could reasonably have been understood as implying the defamatory facts Weller alleged them to have implied. Thus, we find no error in permitting these statements to be submitted to the jury.

### 2. *The Context and Tenor of the Broadcasts Did Not Negate the Impression That the Defamatory Statements Were Assertions of Actual Fact*

Appellants next contend that the broadcasts were entitled to constitutional protection under *Milkovich* because the broadcasts "merely aired conflicting information on an issue of public importance—the purchase of an expensive work of art for public display." They argue that the broadcasts repeatedly emphasized that appellants were not making any assertions at all, but merely posed open questions "with at least two possible answers, which are expressly left to further investigation." Appellants conclude that the speculative format of an ongoing investigative report negated any impression that the reports implied *actual* facts, because it expressly informed the listener that the actual facts were not yet known.[10]

 In effect, appellants contend that we should find that statements that are phrased in terms of "conjecture" or inquiry into a matter of public

---

[10]In analyzing the scope of constitutional protection, it is essential to recognize that respondents' claim was that the broadcasts *implied* certain defamatory statements. " '[I]f the defendant juxtaposes [a] series of facts so as to imply a defamatory connection between them, or [otherwise] creates a defamatory implication . . . he may be held responsible for the defamatory implication, . . . even though the particular facts are correct.' Prosser, The Law of Torts § 116, 5th Ed. (Supp.1988)." (*White* v. *Fraternal Order of Police* (D.C. Cir. 1990) 909 F.2d 512, 523.) Therefore, "it is the defamatory *implication*—not the underlying assertions giving rise to the implication—which must be examined to discern whether the statements are entitled to full constitutional protection." (*Ibid.*)

concern are entitled to federal constitutional protection under the *Bresler-Letter Carriers-Falwell* line of cases on the theory that these types of statements cannot reasonably be understood as assertions of actual fact. We fail to see any analogy between the type of speech protected under the *Bresler-Letter Carriers-Falwell* line of cases and these broadcasts. Unlike hyperbole or satire, the publication of implied defamatory statements against the background of apparently objective and neutral reporting is almost certain to be understood as factual. Moreover, the implied defamatory facts in this context may be given even more credence by the listener where, as here, the reports profess to be objective, yet subtly imply that the publisher tends to believe the sources alleging the defamatory facts.

In the same manner that the *Milkovich* court rejected the concept that preceding an assertion of defamatory fact by the language, "in my opinion," should insulate the speaker from a defamation action, we reject the notion that merely couching an assertion of a defamatory fact in cautionary language such as "apparently" or "some sources say" or even putting it in the form of a question, necessarily defuses the impression that the speaker is communicating an actual fact.[11]

The use of interrogative language alone does not entitle statements to constitutional protection where, as here, they otherwise can be understood as implying defamatory fact. We think that the interest in permitting free debate on issues of public concern is already adequately protected by the state common-law right of "fair comment"[12] and the other federal constitutional protections enumerated in *Milkovich*.

---

[11]Moreover, appellants' characterization of the series of broadcasts as consistently and accurately presenting both sides of the story and cautioning against drawing any conclusions is not supported by the record. When considered as a whole, it is apparent that appellants went beyond "neutral" reporting of conflicting stories. The tone of the reports from the outset suggested that the local news station had uncovered some shady dealings with the museum and presented Weller's and the museum's response to the allegations with a decided air of skepticism.

[12]In *Brown v. Kelly Broadcasting Co., supra,* 48 Cal.3d at page 732, fn. 18, the court explained that the defense of "fair comment" exists independently of the statutory privilege under former Civil Code section 47, subdivision 3 that appellants relied upon at trial. In California, the "fair comment" defense protects " 'expressions of opinion about public officials, scientists, artists, composers, performers, authors, and other persons who place themselves or their work in the public eye.' " (48 Cal.3d at p. 732.) The "fair comment" defense also applies to false statements of fact" (*Institute of Athletic Motivation v. University of Illinois* (1980) 114 Cal.App.3d 1, 8-9, fn. 4 [170 Cal.Rptr. 411]), if the statements are made without malice. (*Ibid.*) We express no opinion regarding the applicability of the fair comment privilege to this case, but note only that free debate on issues of public concern is adequately protected by the combination of this state's common law privilege and the constitutional protections enumerated in *Milkovich*. Appellants' argument regarding the potential chilling effect on the media if these broadcasts are not protected overlooks the fact that substantial protection already exists, and that appellants were simply unable to persuade the jury of the

Appellants further argue that at least statements to the effect that the candelabra were "ruined in value" or that there "appears to be a sweetheart deal," or that "in our terms, they have lost their virginity," are the kind of "hyperbole" or "imaginative expression" that negates any impression that the broadcasts conveyed assertions of actual facts. Assuming arguendo that these comments are nothing more than hyperbole, these isolated phrases taken out of context are insufficient to overcome the overwhelming impression that the reports implied actual facts.

### 3. The Implied Defamatory Facts Were "Provably False"

■ Appellants next contend that the true value and origin of the candelabra were not objectively verifiable and therefore not "provably false" assertions of fact. (*Milkovich* v. *Lorain Journal Co., supra*, 497 U.S. at p. ___ [111 L.Ed.2d at pp. 19-20, 110 S.Ct. at p. 2706].) Appellants point out that valuation of antiques is an inexact science and that experts could have reached varying conclusions regarding their value. The *Milkovich* court, however, was concerned only that the allegedly defamatory fact be objectively verifiable. In this case, the opinion of an assertedly independent expert that the museum "got a good deal" ultimately convinced appellants that they should retract any assertion that the museum bought the candelabra at a grossly inflated price. Thus, although there may have been a range of reasonable valuations, whether the museum had "acquired the candelabra at a grossly inflated price" could be objectively verified. (See, e.g., *Gill* v. *Hughes, supra*, 227 Cal.App.3d at p. 1309 [assertion that surgeon was "incompetent" is "provably false" in light of fact that an evidentiary hearing on surgeon's competence was held in another proceeding]; *Unelko Corp.* v. *Rooney, supra*, 912 F.2d 1049 [assertion that product "did not work" was objectively verifiable despite the fact that consumers differed as to whether the product was effective].)

Appellants do not assert that the true origin of the candelabra was in any sense similarly "inexact." Obviously, the assertion that the candelabra were once owned by Barbara Herbert and had been stolen or otherwise acquired from her house is either true or false, and subject to being disproved by demonstrating that they had in fact belonged to a Texas family for at least the last 40 years, and that a member of this family sold the candelabra to Weller. In connection with their demand for a retraction, respondents even offered to demonstrate the falsity of appellants' assertions by permitting appellants' attorneys to meet with the former owners.

existence of facts entitling them to such protection. For example, if appellants had persuaded the jury that they actually investigated and accurately reported the allegations made by their sources, the jury would not have found malice and would have found the statements to be privileged.

Appellants nonetheless argue that, as a practical matter, the origin of the candelabra could not be verified at the time the broadcasts aired because respondents refused to disclose the *name* of the former owner. ■ The inquiry whether a defamatory statement is "provably false" under *Milkovich* is concerned only with whether the plaintiff can meet its burden under *Philadelphia Newspapers, Inc.* v. *Hepps, supra,* 475 U.S. 767 [89 L.Ed.2d 783], to prove that the alleged defamatory statement is substantially false. The question is whether the statement is provably false in a court of law (*id.* at pp. 776-778 [89 L.Ed.2d at pp. 792-794]), not whether the defendants knew or could have known it was false at the time it was made. In any event, disclosure of the *name* of the former owner was simply not essential to demonstrating the falsity of appellants' allegations.

Appellants also urge that even if the broadcasts were not protected as a matter of federal constitutional law, we should construe the California Constitution to extend even greater protection to this type of speech than does its federal counterpart. In *Brown* v. *Kelly Broadcasting Co., supra,* 48 Cal.3d 711, our Supreme Court rejected a similar contention and clearly signaled its reluctance to provide greater protection to defamation defendants under the state Constitution. In *Brown,* the defendant argued that the privilege set forth in former Civil Code section 47, subdivision 3, should apply to media broadcasts regarding private persons if the broadcasts involve a matter of public interest. The practical effect of the application of former Civil Code section 47, subdivision 3, would have been to require private persons to make a showing of malice before liability could be imposed. The court reasoned: "Article 1, section 2, subdivision (a) of the California Constitution states, 'Every person may freely speak, write and publish his or her sentiments on all subjects, *being responsible for the abuse of this right.* A law may not restrain or abridge liberty of speech or press.' (Italics added.) ■ This provision makes clear that the right to speech is not unfettered and reflects a considered determination that the individual's interest in reputation is worthy of constitutional protection. The federal Constitution, by contrast, contains no express provision imposing responsibility for abuse of the right of free speech. This difference refutes defendants' policy argument that our state Constitution weighs in favor of a standard of fault higher than that required under the federal Constitution." (*Brown, supra,* at p. 746.)

Appellants attempt to distinguish *Brown* by noting that *Brown* addressed only the question whether the state Constitution should impose a higher standard of fault, whereas in this case appellants are seeking protection for a type of speech that they would label as "opinion" or "conjecture" for purposes of state law. If anything, however, the extension of state constitutional law that appellants seek would be even more expansive than the

protection rejected by the court in *Brown*. If appellants' argument were to prevail, similar false broadcasts would be protected without regard to the degree of fault involved in their publication *and* without regard to the plaintiff's status as a private individual. We read the *Brown* court's extensive refutation of the policy arguments advanced in favor of expanded constitutional protection for media defendants as a clear signal that such expansion is not warranted under our state Constitution. (48 Cal.3d at pp. 746-756.)[13]

## II.

### Expert and Lay Testimony on Defamatory Meaning

Appellants contend that the trial court erred in denying their motion to exclude the testimony of Dr. Lakoff, a professor of linguistics, concerning how the average viewer was likely to understand the broadcasts concerning the origin and value of the candelabra. (See, e.g., *MacLeod* v. *Tribune Publishing Co.* (1959) 52 Cal.2d 536, 546-547[343 P.2d 36].) Appellants argue that Dr. Lakoff should not have been permitted to testify on this subject because the meaning of the language used, and its likely interpretation by the average viewer, is not a subject sufficiently beyond the common experience of the jury that expert testimony would be of any assistance. (See Evid. Code, § 801.) They further assert that the error was prejudicial because Dr. Lakoff's testimony imbued respondents' interpretation of the broadcasts with the aura of scientific authority and induced the jury to substitute the judgment of the expert for its own.

Appellants' argument has some initial appeal because common sense tells us that the average juror has experience with interpreting the English language. However, section 801 of the Evidence Code does not require that the jury "be wholly ignorant of the subject matter of the [expert] opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard. Instead, the statute declares that even if the jury had some knowledge of the matter, expert opinion may be admitted whenever it would 'assist' the jury. It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when 'the

---

[13]Appellants argue that the trial court erred in permitting the jury to decide whether the broadcasts, or parts thereof, were "opinion" in reliance on *Good Government Group of Seal Beach, Inc.* v. *Superior Court* (1978) 22 Cal.3d 672 [150 Cal.Rptr. 258, 586 P.2d 572]. We need not resolve this question because, after applying the *Milkovich* analysis to these broadcasts, we conclude that the broadcasts are not entitled to the constitutional protection that appellants claim. For the same reason we do not address appellants' additional argument that the instructions the court gave to the jury that were intended to guide it in deciding whether the broadcasts were fact or opinion under pre-*Milkovich* law were erroneous.

subject of inquiry is one of such common knowledge that men [and women] of ordinary education could reach a conclusion as intelligently as the witness.' " (*People* v. *McDonald* (1984) 37 Cal.3d 351, 367 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011].)

Thus, for example, expert testimony regarding psychological factors that have been identified through empirical studies affecting eyewitness identification may be admitted despite the fact that most jurors will know from common experience that an eyewitness identification can be mistaken based on factors such as lighting, proximity and duration of observation. (*People* v. *McDonald*, *supra*, 37 Cal.3d at pp. 368-369.)

We are persuaded that Dr. Lakoff's testimony provided the jury with information sufficiently beyond its common experience that it was of assistance in determining whether the average viewer would have understood the broadcasts as implying defamatory facts.[14] Dr. Lakoff explained that linguists are able to identify and explain how certain rhetorical devices or patterns of speech convey implicit meaning. She then applied these techniques to the broadcasts in dispute and elucidated how the context, juxtaposition of certain pieces of information, the choice of words, and the tone and inflection of the speakers, were likely to affect the viewer's understanding of what was being said expressly and implicitly.

Although the average juror no doubt could also listen to the broadcasts and understand their meaning, he or she is not as well equipped as is a linguist to explain the disparity between the words expressly stated and the implicit meaning conveyed. To the extent that linguistics provides a method to articulate how and why the broadcasts implied that Weller had sold stolen property to the de Young Museum at a grossly inflated price, or any of the other alleged implied defamatory facts, it may have aided the jury in identifying the evidentiary basis of the implicit meaning they perceived. The trial court's decision to admit or exclude expert testimony will be reversed only if that decision constitutes an abuse of discretion. (*People* v. *McDonald*, *supra*, 37 Cal.3d 351.) We therefore find no abuse of discretion in the admission of Dr. Lakoff's testimony.

■■■ Appellants further assert that the court erred in permitting silver expert Anthony Phillips to offer lay opinion regarding the implied meaning

---

[14]Although we have found no California cases directly addressing the admissibility of expert testimony for the purpose of aiding the jury in determining whether a statement or series of statements implied any defamatory facts, the practice is not unprecedented. (See *Montandon* v. *Triangle Publications, Inc.* (1975) 45 Cal.App.3d 938 [120 Cal.Rptr. 186, 84 A.L.R.3d 1234].)

of the broadcasts.[15] Appellants are correct that lay opinion is not admissible for the purpose of proving that the alleged defamatory statements in fact were understood as implying defamatory facts. (See *Hearne v. De Young* (1898) 119 Cal. 670, 677-678 [52 P. 150].) However, in this case, Phillips's testimony was offered in his capacity as a silver expert familiar with the profession, and the statement regarding his characterization of broadcasts was admitted only as an explanation for the basis of his opinion that such implied defamatory facts would damage respondents' reputation as silver dealers.

### III.

### CLAIMED INSTRUCTIONAL ERRORS

Appellants also claim several instructional errors require reversal.

### 1. *Instructions on Burden of Proof*

The court refused to give one of appellants' proposed jury instructions, which stated in pertinent part: "Minor inaccuracies or omissions of minor details are not sufficient to amount to falsity. Instead, in determining whether the plaintiff has satisfied his burden of proving falsity, you must consider whether any false statement created a defamatory implication that would not have been created had the broadcasts stated the fact truthfully.[16] If you conclude that the alleged defamatory statement was substantially true, then plaintiff has failed to satisfy his burden of proof." Instead, the court gave an instruction that simply stated that the plaintiff had the burden of proving that the alleged defamatory statement "was substantially false." Appellants argue that because this instruction did not specifically explain that proof of minor inaccuracies or omissions of minor details is insufficient to carry the plaintiffs' burden of proving that defamatory implications were substantially false, the jury might not have understood that if the "gist" or "sting" of the defamatory broadcasts was substantially true, then respondents failed to carry their burden of proof.[17]

---

[15]Phillips stated that the broadcasts would have been very damaging to respondents' reputation and explained that the basis for his opinion regarding the likely effect on respondents' reputation was that the broadcasts implied "that the guy is dealing in stolen property" and "that the museum has been grossly overcharged."

[16]This aspect of the instruction would have been misleading because it could be understood as requiring that the plaintiffs prove falsity of the express statements rather than falsity of the implied defamatory facts.

[17]The concept that it is the gist or sting of the alleged defamatory statements that must be false rather than the specific details of the charge is deeply rooted in our common law. (See, e.g., *Hearne v. De Young, supra*, 119 Cal. at pp. 673-674.)

The instruction given adequately explained that it was respondents' burden to prove that the alleged defamatory statements were substantially false. In any event, the alleged "gist" or "sting" of these broadcasts was that respondents sold stolen property to the de Young Museum at a grossly inflated price. The evidence that these implied assertions of fact were false was overwhelming. The defense of "substantial truth" is of assistance to appellants only to the extent that the *implied* defamatory facts are substantially true. Thus, even if appellants' proposed instruction had been given, the result would have been the same. (*LeMons* v. *Regents of University of California* (1978) 21 Cal.3d 869, 876 [148 Cal.Rptr. 355, 582 P.2d 946].)

## 2. *Incremental Harm Doctrine*

Appellants next assert that the court should have instructed the jury on the "incremental harm" doctrine that was recognized in the now overruled *Masson* v. *New Yorker Magazine, Inc.* (9th Cir. 1989) 895 F.2d 1535, 1541 (see *Masson* v. *New Yorker Magazine Inc.* (1991) 501 U.S. __ [115 L.Ed.2d 447, 111 S.Ct. 2419].) We do not reach the merits of this argument because appellants do not argue that the instructions given were incorrect. Instead, they contend that the error is one of omission. The issue, therefore, has been waived by appellants' failure to cite to us any instruction it proposed explaining the incremental harm doctrine that the trial court refused to give. (See, e.g., *Delia S.* v. *Torres* (1982) 134 Cal.App.3d 471, 481 [184 Cal.Rptr. 787]; *Channell* v. *Anthony* (1976) 58 Cal.App.3d 290, 318 [129 Cal.Rptr. 704].)

## 3. *Sufficiency of the Retraction*

 In accordance with Civil Code section 48a, subdivision 2, the court instructed the jury that the plaintiff is limited to proven special damages if the defendant "published or broadcast [a retraction] in substantially as conspicuous a manner . . . as were the statements claimed to be libelous." Appellants object to the addition of the following language: "For a correction to be legally sufficient and effective, it must be full and complete and cannot be evasive or equivocal, nor partial or hesitant, and it cannot contain any insinuations. It must be an honest endeavor to repair all the wrong caused by any defamatory statements or insinuations."

Appellants contend that the only question for the jury is whether the retraction appeared in "substantially as conspicuous a manner . . . as were

the statements claimed to be libelous." We do not agree.[18] An equivocal or incomplete retraction obviously serves no purpose even if it is published in "substantially as conspicuous a manner . . . as were the statements claimed to be libelous." This principle was recognized in *Turner* v. *Hearst* (1896) 115 Cal. 394 [47 P. 129]. The court held that in order for a defendant to rely upon a retraction in mitigation of damages, "it should appear that it was fully, fairly, and promptly made, and is such as an impartial person would consider reasonable and satisfactory under the circumstances of the case." (*Id.* at p. 404.) Indeed, in *Twin Coast Newspapers, Inc.* v. *Superior Court* (1989) 208 Cal.App.3d 656 [256 Cal.Rptr. 310] the court implicitly endorsed the application of the common law definition for the sufficiency of a retraction that the jury was instructed on in this case. The court concluded that the particular retraction before it was sufficient as a matter of law because the facts relating to the manner of its publication were undisputed and no reasonable jury could conclude that it had not been published in "substantially as conspicuous a manner." The court further adjudged the retraction sufficient because "[t]*he body of the retraction fully corrected every aspect of the defamatory publication, without reservation or evasion, acknowledged that the earlier report was erroneous, and expressed the publisher's regret over the error.*" (*Id.* at pp. 662-663, italics added.)

We, therefore, find no error in the instructions given.

### IV.

#### DAMAGES

Appellants contend that the evidence of actual injury to reputation and of emotional distress is not sufficient to support the amount of the verdicts and that the award is excessive. They further contend that the jury should not have awarded presumed damages to Weller for injury to his reputation, in addition to proven damages.

" 'The determination of damages is primarily a factual matter on which the inevitable wide differences of opinion do not call for the intervention of appellate courts. [Citation.] An appellate court, in reviewing the amount of damages, must determine every conflict in the evidence in respondent's favor and give him the benefit of every reasonable inference. [Citation.] An appellate court may not interfere with an award unless "the

[18]Appellants object only to the instructions given. They do not contend, and we therefore do not decide whether, if the retraction were only partial, the jury should have been informed that it could not consider the effect of any retracted statements in assessing damages.

verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury." ' " (*Rodriquez* v. *McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626, 655 [151 Cal.Rptr. 399].)

 We have reviewed the record and determined that Weller introduced substantial and competent evidence of injury to reputation, and that the amount of damages awarded is not so out of proportion with the evidence to suggest that the jury was influenced by passion or prejudice.[19]

Prior to the broadcasts Weller had a very good reputation as an antique silver dealer. In support of his claim of injury to that reputation, Weller introduced the testimony of two silver experts who testified regarding the importance of having a good reputation in the antique silver business and that the implied allegations that the candelabra were stolen and that they were inauthentic, or grossly overvalued, would seriously damage the reputation of an antique silver dealer. In addition, the director of the de Young Museum testified about the importance of having a reputation for honesty and integrity. Weller also testified that at the time of the broadcasts he was still attempting to establish a growing business with a reputation for selling museum-quality goods. After the broadcasts he was "besieged" with telephone calls from dealers and collectors and he had difficulty explaining "why you've been on the air for six nights," if there were no truth to the reports. In addition, he felt compelled to attend as many meetings of antique dealers as possible, and generally to make himself available to dispel doubts created by the broadcasts. He was still responding to such doubts as of the date of trial. Weller had been told by an appraiser that one of her clients refused to deal with Weller or Argentum because "we were those people who had been involved in scandal," and that the sister-in-law of one of Argentum's clients had said she would be "very leery about doing business with us." Weller testified that there were only two other dealers in California dealing the same type of silver, one of whom had died and the other was on the verge of retirement. He had therefore projected, prior to the broadcasts, that at or near the time of trial he would have been the sole California dealer in the kind of antique silver he was selling. Weller believed this projection had not come true largely due to the effect of the broadcasts on his reputation and the fact that Weller had to spend much of the last year rehabilitating his and Argentum's image instead of devoting himself to

[19]Appellants argue the decision in *Gertz* v. *Robert Welch, Inc.*, *supra*, 418 U.S. 323 [41 L.Ed.2d 789], imposes a higher standard for proof of damages upon the plaintiff in a defamation action. All that *Gertz* requires, however, is that the plaintiff produce "competent" evidence of injury. (*Id.* at p. 350 [41 L.Ed.2d at p. 811].) The *Gertz* court expressly deferred to the state courts to define what constitutes competent evidence. (*Ibid.*)

doing business. He observed a drop in foot traffic in the shop following the broadcasts and believed that there was a substantial drop in consignments.

Although Weller did not offer the direct testimony of any customer or potential customer who refused to do business with him or Argentum, he did at least provide, through his own testimony, evidence of statements made by potential customers that tended to prove injury to his reputation. The broadcasts were published on seven different occasions and reached approximately two hundred thousand homes. The jury could reasonably infer that there were numerous others who had heard the broadcasts and formed a negative opinion of Weller and Argentum. As a practical matter, Weller's reputation was permanently tarnished because he could never identify most of these listeners and negate the effects of the broadcasts through personal contact.[20]

In support of his claim for damages for emotional distress, Weller testified that he initially suffered from anger, worry, sleeplessness, loss of appetite and depression. After several weeks he said these feeling "settle[ed] into long-term depression." He further testified that he had very distressing conversations with the former owner of the candelabra and her representative, who were upset that a transaction they intended to keep quiet was the subject of so much publicity. Weller also was subjected to jokes from other dealers, and was constantly embarrassed by having to explain that he was not a thief and by the "wall of polite skepticism." Weller further testified regarding the humiliation he felt in explaining these events to his family, and the sorrow he experienced because his mother died before he was vindicated by the jury verdict.

In support of their contention that the damages are excessive, appellants cite numerous cases in which the courts have concluded that the damage awards were excessive. "The vast variety of and disparity between [*sic*] awards in other cases demonstrate that injuries can seldom be measured on the same scale." (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 65, fn. 12 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878].) This kind of comparative analysis is simply no substitute for a review of the record in this case against the "historically honored standard of reversing as excessive only those judgments which the entire record, when viewed most favorably

---

[20]The Supreme Court recently described the quandary faced by private individuals who have been defamed in the mass media as follows: "A tradesman in the 18th century defamed by a customer could rely on his good reputation with others and perhaps had a reasonable opportunity to present the truth to those who mattered to his livelihood. In today's business market, there is little realistic opportunity for self-help when a tradesperson . . . is disparaged to thousands of potential customers by a television program." (*Brown* v. *Kelly Broadcasting Co., supra,* 48 Cal.3d at p. 744.)

to the judgment, indicates were rendered as a result of passion and prejudice on the part of the jurors." (*Id.* at p. 65, fn. 12.)[21] Although failure to prove special damages may be a factor in concluding that damages for injury to reputation are excessive (see *Di Giorgio Fruit Corp.* v. *AFL-CIO* (1963) 215 Cal.App.2d 560, 578-579 [30 Cal.Rptr. 350]), the failure of such proof certainly does not compel the conclusion, especially where, as here, Weller did not claim any special damages in his individual capacity.[22] Our review of the record, when viewed most favorably to the judgment, leads us to the conclusion that, although the damages awarded were indeed high, they are not so out of proportion with the evidence that we should infer that the judgment is the product of passion or prejudice.

█ Finally, appellants contend that presumed damages for injury to reputation may be awarded only if the plaintiff is unable to prove actual damages. They therefore urge this court to set aside the award of presumed damages on the ground that it constitutes a "double recovery." Appellants argue that the rationale for allowing presumed damages, i.e., that certain defamatory statements are certain to cause injury to reputation yet "in many cases the effect of the defamatory statements is so subtle and indirect that it is impossible directly to trace the effects thereof in loss to the person defamed" (Rest., Torts, § 621, com. a, at p. 314), disappears when, as here, the plaintiffs are able to prove some actual injury to reputation. It does not, however, follow that if a plaintiff offers proof of actual injury to reputation he has proved or can prove all the likely effects of the damage to his reputation. If we were to accept appellants' contention that presumed damages are available only in lieu of damages for proven injury to reputation, the plaintiff who can prove $1 of actual injury would be precluded from further recovery, whereas the plaintiff who cannot marshal *any* evidence of actual injury would not be so limited.

Appellants also suggest that the First Amendment compels the conclusion that presumed damages may be recovered only in the absence of proven injury to reputation. In *Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. at

---

[21]Appellants place particular reliance on *Wollersheim* v. *Church of Scientology* (1989) 212 Cal.App.3d 872, 905-907 [260 Cal.Rptr. 331], in which the court found damages of $5 million for intentional infliction of emotional distress to be excessive and reduced it to $500,000. Appellants argue that if the award in *Wollersheim* was excessive despite the introduction of expert testimony of a permanent and severe psychological injury, then the award in this case is certainly excessive, because *no* expert testimony of permanent psychological injury was introduced. This argument illustrates why such comparisons are unhelpful. The factual differences between *Wollersheim* and this case are numerous. Not the least of these differences is that in *Wollersheim*, the plaintiff suffered from a preexisting mental illness.

[22]Because we conclude Weller presented substantial and competent evidence of injury to reputation, we need not address appellants' additional argument that damages for emotional distress may be recovered only if the plaintiff can prove injury to reputation.

page 349 [41 L.Ed.2d at pp. 810-811], the only limitation placed on recovery of presumed damages was that the plaintiff must prove that the defamatory statements were published with "knowledge of falsity or reckless disregard for the truth." The jury specifically found that Weller met that burden.

## CONCLUSION

The judgment is affirmed.

Newsom, Acting P. J., and Smith, J.,* concurred.

## APPENDIX

### 2/3/84

VAN AMBURG: While we're on silver tonight, Channel 7's Carol Ivy has been on the case of the DeYoung Museum's confusing candelabra, and she's here in the studio with late details on that story. Carol?

CAROL IVY: You know, Van, the man sentenced today in federal court is well known in this city for his voluntary work in appraising antiques for the DeYoung Museum. And now Jerry Durham's name and others have come up in a Channel 7 investigation into the Museum's purchase of some very expensive candelabra. Did the DeYoung Museum pay a grossly inflated price or did they actually acquire an excellent addition to their collection?

They are described in the Museum's magazine as rare candelabra made in 1811 by English silversmith Paul Storr. They were sold to the DeYoung in January 1983 for about $65,000 by Michael Weller, part owner of Argentum Antiques on Union Street. He told the DeYoung he got them from a Texas antique dealer who got them from a Texas estate where they've been for more than a hundred years. The Texas dealer told me the same story over the telephone, but, like Mike Weller, refused to give the former owner's name. Other sources in the antique community say none of this is so, that the candelabra actually belonged to a sculptress named Barbara Herbert who died at her home on Green Street five years ago at age 90 and that pieces of her property, including the candlesticks, were sold, given away, or perhaps even

---

*Associate Justice of the Court of Appeal, First District, Division Two, sitting under assignment by the Chairperson of the Judicial Council.

stolen during the years just before her death. The sources say they are not worth what the DeYoung paid for them. Over the years the candlesticks were wired for electricity. DeYoung officials did not care to be interviewed on camera, but told me they knew the candelabra were, in their words, "not pristine" and that wiring had been removed and holes filled in before the sale, but that the quality of the work supported the price. That work, I learned, was done here at a combination video rental and metal arts store in San Francisco. The silversmith was paid $450 for the repairs on the elaborate candelabra and remembers them as being among much work he has done for Argentum Antiques and Mike Weller. He also knows Jerry Durham as someone who brought work to him from Argentum and Michael Weller. Durham is the antique appraiser who was sentenced this morning for insurance fraud involving a false stolen silver claim. He denies, however, knowing anything about the candlesticks in question, but in another twist he admits that he once lived in an apartment in Barbara Herbert's house--the real source according to some people of the DeYoung's candlesticks. The DeYoung would not allow us to bring cameras in to photograph the candelabra on display. So, instead, I brought with me a man who worked for Mrs. Herbert for more than 30 years, who, in his words, ought to know, after all, he polished them nearly everyday. Lonnie Williams took one look the recognition that was almost instant, as he explained later outside.

LONNIE WILLIAMS: Definitely Mrs. Herbert's property, definitely, with no doubt, no doubt in my mind at all.

CAROL IVY: And so for the man who was Barbara Herbert's constant companion, there is no mistaking the candlesticks. But others say they can provide proof of the history that they had given the DeYoung. But tonight, Van, I'm afraid the mystery continues because those people are unwilling to tell us who in Texas owned the candelabra that the DeYoung has.

VAN AMBURG: Really interesting story. You put together all of the steps as it went along. Uh, what do you think?

CAROL IVY: I think it's still a mystery at this point.

VAN AMBURG: It's still a mystery. I'm not trying to put you on the spot and make a decision but it's always "buyer beware." But, we've heard about cases like this in the past where there have been an awful lot of money spent on one and then it would be written off at the other end and all kinds of things would happen in between.

CAROL IVY: And we don't know enough about it yet actually to make those kinds of allegations and those kinds of allegations may never be made. The question is where those Barbara Herbert's candlesticks and are they worth the price the DeYoung paid or are they in fact from an estate in Texas and are they the real Duke of Cumberland candlesticks which the DeYoung thinks they are?

VAN AMBURG: As they used to say in radio: "stay tuned."

CAROL IVY: "Stay tuned."

VAN AMBURG: Thank you, Carol.

<u>2/24/84</u>

VAN AMBURG: Last night here on our news at 6 we reported on the growing mystery surrounding a pair of very elegant candelabra purchased by the DeYoung Museum in San Francisco from a local antique dealer about a year ago. The dealer told his side of the story and he said the DeYoung had a long history in that candelabra. But our sources have another version tonight and Channel 7's Carol Ivy is back in the studio with us with more on that story. Very confusing candelabra in this case.

CAROL IVY: Very confusing. Van, the museum is standing by its purchase of the candelabra tonight, saying its experts are convinced the history they were given is correct. The DeYoung believes t hey came from the estate of a Texas family which owned them, they say, for 100 years. The candelabra may have once belonged to the Duke of Cumberland. They also insist the $65,000 they paid for the candelabra is realistic, even cheap. Yet, our sources continue to say they came from the home of a San Francisco woman, Barbara Herbert. She died five years ago. And I talked with several experts today who told me that even if the

candelabra are true Paul Storr creations, the alterations done to them reduce their value dramatically.

Yesterday a man who'd worked for Barbara Herbert for more than 30 years went with me to the DeYoung. The museum would not allow cameras in to photograph the questioned candelabra. But there was no question in Lonnie Williams' mind. He'd polished them hundreds of times, and he said they were definitely Mrs. Herbert's. Mr. Williams is no art expert, of course, and is relying only on his good memory. But today I talked with four separate well-known appraisers who told me that even if the candelabra are real Paul Storr creations, the fact they were once electrified and then the wiring holes filled in before sale to the DeYoung would diminish their value greatly. Yesterday, I told you the Museum knew they'd been altered and restored. I showed you where the work had been done for $450 in this video store and metal shop in San Francisco. Among those I spoke with over the telephone today, Sigmund Rothschild of New York, one of the world's foremost authorities in fine arts. I quote Mr. Rothschild: "If they are authentic Paul Storr, they have been ruined in value by the work done . . . in our terms, they have lost their virginity." Last year, Christie's of London sold this unaltered garniture by Paul Storr, a single four-branch candelabra and two double-branch, for $28,600, not even half what the DeYoung paid for theirs. I also learned today that approximately 15 years ago a team of photographers and experts from an East Coast museum went to Barbara Herbert's home on Green Street. She was considering donating much of her collection to that museum. They may still have those photographs and sources say they may include the questioned candelabra.

We are in contact with that East Coast museum and efforts are being made to get copies of whatever photographs may still exist. Meanwhile, the DeYoung says it is not possible to bring our cameras in to photograph the controversial candelabra. They say they are packing up the Vatican collection just now and can't accommodate Channel 7, but they also continue to believe the history provided them by antique dealer Mike Weller. He is that San Francisco dealer who sold the candelabra to the Museum. They say they will provide me with their own comparable price list for recent purchases of Paul Storr works which they say will justify the price they paid.

VAN AMBURG: Cause any fear at all within the City?

CAROL IVY: We had numbers of telephone calls primarily from people who are friends of the DeYoung and who are perhaps a bit concerned about just what the answer is to this mystery. Again, we are not alleging anything at this point. We are simply saying there are two stories about these candelabra.

VAN AMBURG: And trying to put them together and come up with one answer.

CAROL IVY: Exactly.

VAN AMBURG: And this will go on for a while?

CAROL IVY: I think so.

VAN AMBURG: 'Cause the experts disagree a lot over things like this. O.k., thank you, Carol.

<u>2/27/84</u>

VAN AMBURG: We have more tonight to report on the controversy over that very confusing candelabra and the questionable high price paid by the DeYoung Museum in San Francisco for the arts objects. Channel 7's Carol Ivy back with us in the studio with more on her exclusive reports on where this candelabra came from.

CAROL IVY: Van, for the third day, DeYoung Museum officials refused to allow us to bring a camera in to photograph the controversial candelabra. Those officials stick to their story that they are rare Paul Storr creations and despite alterations over the years, worth the $65,000 the Museum paid for them. But the officials do say today that they have decided to launch their own investigation into the history of the candelabra. Our sources continue to insist they came from the collection of a well-known San Francisco sculptress named Barbara Herbert and did not, as the DeYoung has been told, come from a Texas estate. The house where Barbara

Herbert lived for more than 20 years is being restored now. This is where friends and former employees say they saw these candelabra. The man who bought the historic house from the Herbert estate and is restoring it to operate as a bed and breakfast hotel has heard all the stories. How the internationally-known sculptress, sick and aging, retreated to a few small rooms upstairs. Downstairs she had for a time rented space to two men. One of those men, Sausalito antique dealer Jerry Durham, was sentenced last week in federal court after he pleaded guilty to an insurance fraud involving more than a hundred thousand dollars' worth of allegedly stolen silver. Mrs. Herbert, because of problems no one can quite recall, had to force Durham and his roommate to leave her home and then, years later, Jerry Durham's name is linked again to hers. Jerry Durham has done a good deal of appraisal work for the DeYoung Museum. But he disclaims any knowledge of the candelabra. They were sold to the DeYoung by a friend and associate of Jerry Durham's, Michael Weller of Argentum Antiques, who told the DeYoung they came from a Texas estate. Weller's shop on Union Street is less than a block behind Mrs. Herbert's house. An attorney who represented Barbara Herbert during the last years of her life said that walking into her home here on Green Street was in fact almost like walking into the DeYoung Museum. In his words, "she had collected over the years so many wonderful and obviously expensive things." And yet another attorney who handled the probate of Mrs. Herbert's estate was shocked when I told him she may have owned candelabra for which the DeYoung had paid $65,000. In his words, "I never say the woman nor her house until she was dead. By then there was not a total of $65,000 work of anything." We are continually to ask to photograph the candelabra on display here. We also asked officials of the DeYoung if we could bring in an independent appraiser to take a look at the candelabra and give his opinion of just how much they're worth. They say they'll consider that. And I've learned they have been trying to talk with Lonnie Williams. He's the man who worked for Barbara Herbert more than 30 years and last week went with me to the DeYoung and identified the candelabra as hers.

Now Mr. Williams told me he does not see any reason to go to the DeYoung again, and, like Channel 7, he's concerned we weren't allowed to take pictures of the controversial candelabra the day he did go there. Meanwhile, Texas sources are providing information useful in explaining the story that the candelabra had belonged to a Texas family for more than 100 years. In the words of some skeptical art experts there, I quote: "Darn little art in any form has been in Texas as long as 100 years." Van?

VAN AMBURG: And the story gets curiouser and curiouser.

CAROL IVY: It does.

VAN AMBURG: Is there anywhere to go now? Or is the DeYoung Museum going to come forward in this case?

CAROL IVY: Uh, they have said that they may allow us to come in with an independent appraiser who is a member of the American Society of Appraisers and . . .

VAN AMBURG: A-ha!

CAROL IVY: . . . a well-known appraiser in the Bay Area. He has said he would be willing to go anytime Wednesday, anytime Friday to take a look.

VAN AMBURG: We can't wait.

CAROL IVY: I can't wait.

VAN AMBURG: To see what he says. O.k., Carol, thank you.

## 2/28/84

VAN AMBURG: Beginning last week we started reporting on some doubts about the true value of a pair of antique silver candelabra bought by San Francisco's DeYoung Museum about a year ago. Our investigation done by Carol Ivy indicates that $65,000 purchase price was simply way too high for the candelabra. Carol's back in the studio with us tonight with the latest on what appears to be a sweetheart deal between the antique dealers.

CAROL IVY: Van, it does look that way. And remember, we're talking about a public museum which still refuses to allow our cameras in to photograph the candelabra. This whole

controversy began when a Sausalito antique dealer, Jerry Durham, was sentenced in Federal Court last week after pleading guilty in an insurance fraud case. One hundred thousand dollars' worth of silver items were involved in that case. Callers to Channel 7 then claimed there was a connection between Jerry Durham and the rare Paul Storr candelabra purchased by the DeYoung. Durham is an associate of the antique dealer who made the sale of the candelabra to the Museum but both Jerry Durham and Museum officials deny any such connection. However, according to the Museum, Jerry Durham has done appraisal work for them in the past and in a rather bizarre twist Jerry Durham admits that he once lived in the home of Barbara Herbert. That's the woman our sources say owned the candelabra for more than 30 years. But for anybody who cares about how a museum spends money, perhaps the biggest question in all of this is just how those candlesticks were acquired. DeYoung officials late today said that no outside experts ever looked at the candelabra before the DeYoung bought them for $65,000 and they say it's not unusual for the Museum to buy without independent appraisers' opinions and, in this case, Museum curator Laura Camins dealt directly with Argentum Antiques and Michael Weller, the dealer who told the Museum he got them from a Texas estate. Weller is reportedly out of town, Argentum Antiques had a temporary closed sign out today, and when I called Weller's lawyer, I was told he was out of the country. So once again no one could offer proof of the claimed Texas origins. Nor could they disprove our source's contention that the candelabra actually came from the home of sculptress Barbara Herbert, who died five years ago. Her long-time employee, Lonnie Williams, has identified the candelabra as hers, and today I mailed a photograph of the candelabra to Mrs. Herbert's sister, who told us over the telephone that in her words many things, including expensive outdoor lamps, had disappeared from Barbara Herbert's home on Green Street. Meanwhile, the DeYoung insists the candelabra are real Paul Storr creations and has provided a list price comparisons which show that the $65,000 they paid is actually quite reasonable.

And there is a late development today that I'll be checking out further. There is a note that exists, an anonymous note, written to a close friend of Barbara Herbert's, the woman we think owned the candelabra. Now, that note is dated and post-marked four months before Barbara Herbert's death from cancer in 1979. That note warns and I quote: "That someone was looting her home." And we are going to be taking a look at that tomorrow.

VAN AMBURG: O-o-o. That just turned up, huh?

CAROL IVY: Just turned up.

VAN AMBURG: You also went to New York and talked with experts there. I mean by telephone.

CAROL IVY: We didn't go. We spoke to experts . . .

VAN AMBURG: I meant by telephone. But they told you here that no matter if this was made by that person that since it had been drilled for electricity and refilled it wasn't worth the money that they'd paid for it.

CAROL IVY: The New York expert said that that was his opinion. It was also the opinion of another appraiser we spoke with. But it's an interesting thing, Van, in the art world one of the questions is just who is correct? I don't know. I have to rely on experts and we're hoping that the Museum relies on experts and sometimes it's simply one person's opinion against another.

VAN AMBURG: It gets curiouser and curiouser as they say.

CAROL IVY: As we've said.

VAN AMBURG: Thank you, Carol.

<u>3/1/84</u>

VAN AMBURG: This story has been unfolding like a mystery tale and the clues just keep on coming in on this story. Channel 7's Carol Ivy is with us again tonight in the studio with the latest on that controversial and very confusing candelabra and where they came from and did San Francisco's DeYoung Museum pay too much for them? With details on that, here's Carol.

CAROL IVY: We have been reporting it for quite some time and, Van, it was only a week ago we first heard about the antique silver candelabra the DeYoung bought for $65,000. We had reported then that a Sausalito antique dealer, Jerry Durham, was sentenced in federal court for insurance fraud involving about one hundred thousand dollars' worth of silver objects. Callers told us there was a link between Durham and another antique dealer who actually sold the candelabra to the Museum. They said that they came from a Texas estate. However, our sources insist the candlesticks belong to a San Francisco artist, Barbara Herbert, who died five years ago. Well, Jerry Durham and another man once rented an apartment in Herbert's home, which is where friends and some of her employees insist they saw candelabra that look exactly like the ones at the DeYoung.

These are the candelabra locked behind plexiglass at the DeYoung Museum. We were allowed in late yesterday to photograph them. Alteration work done to photograph them. Alteration work done to fill in holes made when they once were wired for electricity is quite evident. Some experts say that that work greatly reduces their value. But with that debate still raging and Museum officials still reluctant to give us the name of the Texas estate they were told they came from, I took a photograph of the candelabra to a long-time friend of Barbara Herbert's. She's the woman our sources say actually owned the candelabra and from whose home on Green Street they may have disappeared.

GRACE MADDUX: They're absolutely exquisite. I remember she had them in that sitting room up there on the second floor over by the windows--by the big windows there. She had two gorgeous candelabra there. Now, these could be the ones and I'm not and I couldn't, I couldn't say for sure, I really couldn't.

CAROL IVY: But Lonnie Williams who worked for Barbara Herbert for more than 30 years is sure that they are hers. He also says Mrs. Herbert did have a great deal of trouble in her last years with Jerry Durham and his roommate, Jerry Posner. They had to be told to leave an apartment they rented in the basement of her home which now is being renovated. Mrs. Maddux remembers the men all too well. At one point, she says she even called the District Attorney's Office asking someone to investigate, but they never did.

GRACE MADDUX: And they'd drive a van up in back there at night and she'd hear them, you know, but she wasn't capable of doing anything. And then, of course, when they went to the storeroom, ha.' the stuff was gone.

CAROL IVY: I called Durham to ask him about what Mrs. Maddux had said. He told me to talk to his lawyer, but phone calls to that office have not been returned. Michael Weller, the man who sold the candelabra to the DeYoung, is not due to return to his business for more than a week and his attorney is out of the country. Museum officials say that by next week they will produce papers and photographs from Texas that prove the origins of the candelabra. Grace Maddux remembers photographs being taken too of Mrs. Herbert's treasures.

We appreciate the DeYoung allowing us in to photograph the candelabra, and I look forward to seeing whatever proof they have of the history and I am certain so will the many viewers who have expressed interest in the story, particularly since the DeYoung is a public museum that many of them visit frequently. Now, just before air time, Mr. Jerry Posner did call me and said that we are all wrong or our sources are all wrong. We are not the ones saying these things. He says the sources know nothing of what happened in Barbara Herbert's house and that in fact in his words she was a very tough landlady and that is why he and Mr. Durham left. He says the sources are all wrong about the origins of the candelabra and that what we will find next week will prove that. And in another twist, the sister of Mrs. Herbert, to whom I sent photographs of the candelabra, agrees that she does not remember her sister having any candelabra that look like this at all. And so once again, we are simply posing the question just where did these candelabra come from and did the DeYoung pay a reasonable price for them?

VAN AMBURG: Well, it's really stirred up an awful lot in the antique community from all kinds of people from all over.

CAROL IVY: I think you got one, in fact.

VAN AMBURG: We got some saying that yes they are not what they say they are and others saying they are what they say they are, so it's quite a controversy but we did get into DeYoung today. That took a long time to do.

CAROL IVY: We did and we hope that by next week, Van, we will have some answers to some of these questions.

VAN AMBURG: Super, thank you.

### 3/9/84

VAN AMBURG: We have more tonight on the case of the confusing candelabra at San Francisco's DeYoung Museum. Uh, the big questions have been "Where did certain candlesticks come from?," "How were they acquired?," and "Did the Museum pay too much for them?" Today the Museum told its side of the story. Channel 7's Carol Ivy is here with details on that. Carol?

CAROL IVY: Van, you know the Museum and the man who sold the silver candelabra to the Museum still will not give us the name of the candelabra's last owner. But they have each provided what they are now calling their "final word" on the matter.

CAROL IVY: When we first asked about the origin of the candelabra, Museum officials said they bought them from a local dealer, who got them from a Texas dealer, who got them from a Texas estate where they had been 100 years. And then earlier this week, two weeks after our first inquiry, the director of the DeYoung wrote to give us what he calls his final answer and I quote: "In conclusion, on the basis of the information to date . . . it appears that the candelabra . . . are, in fact, Paul Storr candelabra, that they were owned by a prominent Texas family for a number of years before they were acquired by the museums and that the price paid . . . $65,000 . . . was reasonable." At about the same time the letter from the Museum arrived, we received papers from attorneys representing Michael Weller. He's the San Francisco silver dealer who sold the candelabra to the DeYoung. According to the lawyers, they say this about the origins of the candelabra: "We will set out the true facts . . . our clients were in Dallas, Texas, two years ago . . . they were introduced to a wealthy lady who had moved out of her family home in New Mexico . . . to smaller quarters. She had certain furnishings she could not use . . . among these the Storr candelabra now on display at the DeYoung . . . it is our understanding that these candelabra had been purchased by the lady's mother in the early 1960s from a New York antique dealer." Some 80 years short of the original version of 100 years in a Texas estate, but nonetheless a statement of the origins. Unless, of course, you believe Lonnie Williams, who worked more than 30 years for a San Francisco woman named Barbara Herbert. Williams and others, who knew the late Mrs. Herbert well, insist that the candelabra the DeYoung bought actually belonged to her and somehow were acquired from her former home on Green Street.

Now, some experts have told us that authentic Paul Storr candelabra are numbered, and that ownership can be traced back through the years by those numbers. But in this case, the candelabra are locked behind plexiglass at the DeYoung Museum, and only Museum personnel can handle them. Therefore, we have to presume that they have traced the numbers themselves, and are satisfied with their history and prior ownership. Van?

VAN AMBURG: And so for now, up in the air, but on hold.

CAROL IVY: "Up in the air, but on hold:" that's a good way of putting it.

VAN AMBURG: Ok. Carol, thank you very much.

### 4/2/84

VAN AMBURG: For several weeks now we've been exploring a controversy around a pair of antique silver candlesticks bought by San Francisco's DeYoung Museum. Both the DeYoung and the antique dealer who sold the candelabra maintain they're worth every penny of the $65,000 the Museum paid for those candelabra. Now others have questioned where they came

from and whether or not they really are authentic, and as we have said before, Channel 7 is not saying anybody involved in the candelabra controversy has done anything wrong. We've done some checking and tonight Carol Ivy is back with us in the studio with an update on the confusing candelabra.

CAROL IVY: Well, Van,, you know Edwin Firestone has been a silver merchant for 38 years and he is considered an expert on antique silver. Today Mr. Firestone examined the DeYoung's candelabra and said that in his opinion there is no question they are authentic, made in England by the renowned silversmith Paul Storr.

FIRESTONE: When I first saw them, they're obviously in the style of Paul Storr. Without further examination they look to be Paul Storr. They're obviously early 19th Century, um, which is the period of Paul Storr and the design is reminiscent of others that he's done.

CAROL IVY: Firestone showed me the hallmarks on the base and the loose silver pieces which prove the authenticity. P.S. for Paul Storr the silversmith, next a lion, five hallmarks in all.

FIRESTONE: The next one is the leopard's head crown which is one that from time to time is not on English silver but in this period it's required. The next is the cue for the date letter, 1811, and the next is the sovereign's head which is an indication it was made in the period of George III.

CAROL IVY: Firestone also says he was aware the candelabra had been altered, wired for electricity at some time in their history and then de-electrified and other work done. In February, I showed you the metal arts and video store on 2nd Avenue where some alterations had been made. Museum officials have said they knew about the work when they decided to pay $65,000 for the pair and that, although not pristine, they insist they were worth the price and Edwin Firestone agrees.

FIRESTONE: I can tell you this. I sold a pair a year ago in the trade, I mean they had to be resold again, for $110,000, not electrified, needless to say.

CAROL IVY: But what Firestone and so far no one else will confirm is the candelabra's immediate history. We do know they were sold to the Museum by Michael Weller of Argentum Antiques and that he gave the Museum a history which shows they were owned by a Texas woman. Other local people insist they belonged instead to a San Francisco sculptress, Barbara Herbert, who died several years ago. And although the hallmarks on the candelabra show Mr. Firestone they are authentic, they don't help at all in tracing their ownership.

FIRESTONE: You can say that Paul Storr made it--period. Who he sold it to I don't know.

CAROL IVY: o.k.

FIRESTONE: The way you can trace ownership sometimes is if there is an engraved coat of arms. There is no engraved coat of arms in this case.

CAROL IVY: We have been told that documents do exist to prove the Texas origins. But so far I've been told that I cannot see those documents and that question remains. Representatives of the antique dealer who sold the candelabra to the DeYoung Museum have offered to let Channel 7's lawyers meet the women who they say owned the candelabra, plus review all documents. But, they've attached a condition asking that, at least for now, our attorneys not tell me anything about the history. And that is simply unacceptable, because I could not pass that information on to you. We must also add that in previous stories we described a possible connection between another antique dealer, Jerry Durham, in the sale of the candelabra. Durham did once rent an apartment in the home of sculptress Barbara Herbert and Durham is acquainted with the man who made the sale to the DeYoung. However, we have no reason to suspect Mr. Durham is connected in any way with the candelabra or any other items reported missing from Mrs. Herbert's home after her death. However, Van. there is still that unanswered interesting question which other museums tell me is an unusual situation and that is that we are not allowed to know who the last owner of these candelabra are. Now, we have Mr. Firestone's word for their authenticity and I think it's great that the DeYoung apparently got a good deal, but let's find out where they came from.

VAN AMBURG: Good question. Confusing candelabra. It will probably continue. Thank you, Carol.