Filed 8/16/22 Sharp v. Seven Arts Entertainment CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| GEORGE SHARP, | D079648 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2021-00030060-CU-DF-CTL) |
| SEVEN ARTS ENTERTAINMENT INC., | |
| Defendant and Appellant. | |

APPEALS from an order of the Superior Court of San Diego County, Gregory W. Pollack, Judge. Affirmed in part, reversed in part, and remanded with directions.

Stuart Kane and Shane P. Criqui for Plaintiff and Appellant.

Stillman & Associates and Philip H. Stillman for Defendant and Appellant.

George Sharp sued Seven Arts Entertainment Inc. (Seven Arts) for defamation and invasion of privacy based on four tweets critical of Sharp's business practices that were posted on Seven Arts' Twitter account. Seven Arts filed a special motion to strike the complaint as a strategic lawsuit

against public participation (anti-SLAPP motion). The trial court ruled the tweets were made in a public forum and concerned an issue of public interest, two of them were nonactionable opinions, and the other two were actionable statements of fact. The court therefore granted the motion in part and denied it in part by striking the allegations concerning two of the four tweets.

Both parties appeal. They agree the tweets fall within the scope of activities subject to an anti-SLAPP motion, but disagree on whether Sharp met his evidentiary burden to show his claims have minimal merit as to each of the four tweets. We conclude he did. We therefore affirm in part, reverse in part, and remand for further proceedings.

## I.

## BACKGROUND

A.     *Parties*

Sharp is the chief executive officer (CEO) of Forwardly, Inc. (Forwardly). He describes himself as "an experienced investor and business manager, specializing in creative corporate funding solutions, including but not limited to corporate restructures, mergers and acquisitions." Sharp claims to be "a longtime whistleblower" and "[w]ell-known exposer" of fraud in penny stock trading on the over-the-counter (OTC) market whose "efforts have led to the suspension of several ill-intended, publicly traded issuers and the prosecution of several perpetrators." He maintains a business office in San Diego.

Seven Arts was formed in 2011 to acquire the assets of a film production and distribution company that Peter M. Hoffman founded in 2004. It was originally incorporated in Nevada and later reincorporated in Wyoming. Seven Arts ceased operations in 2016 as a result of a judgment against it and federal criminal charges against Hoffman. Nevertheless,

2

Seven Arts' common stock continued to trade in substantial volumes on the OTC market. Jason Black, a self-described "experienced [CEO] of OTC listed companies" who claims he has "successfully revived delinquent OTC companies and provided new business opportunities and assets to such companies," noticed the trading activity in the spring of 2021. Black organized a shareholder group to take control of Seven Arts, and by an agreement with Hoffman, dated June 4, 2021, and executed on July 23, 2021, Hoffman resigned and Black became the sole director and the CEO of Seven Arts. An amended annual report that Black filed with the Wyoming Secretary of State on June 4, 2021, deleted Hoffman as president and director and added Black as president, secretary, treasurer, and director.

B.    *Electronic Communications*

On July 7, 2021, Sharp included in a tweet on his Twitter account an image of an article concerning Mark Miller, who had been indicted for securities fraud. Twitter user @Lieles responded to the tweet by linking to an article written by securities lawyer Brenda Hamilton that falsely stated Miller was involved in the reinstatement of Seven Arts. Twitter user @DrEyesOnOTC replied to @Lieles's tweet by writing, "Yes, and now the new CEO of [Seven Arts] is Jason Black, a very capable leader and has lots of experience with the OTC." In reply to @DrEyesOnOTC's tweet, Sharp tweeted,

"aaaaaaaaaaaaaaaaaaaaaaaaaaaaaahahahahahahahahahahahahahahahahahah ahahahahahahahaha!!!!!!!!!"

Later the same day, after Black saw these tweets, he sent Sharp an e-mail to "reach out one time before things escalate[d] between [them]." Black wrote that he had known about Sharp for years and "always maintained [he] wouldn't go at [Sharp] as long as [he] didn't come into [Black's] neck of the

3

woods.  But today [Sharp] did."  Black mentioned Sharp's involvement in so-called "pump and dump" schemes (i.e., plans to buy stock, increase its price by spreading false or misleading information, and then sell the stocks at the artificially inflated price), and claimed to "know everything on everyone" and to "have the receipts."  Black accused Sharp of "living in a glass house," and claimed to "know, with specific details, going back a decade," that Sharp was not "clean."  Black asserted he was "a much better ally than enemy"; asked Sharp to "do [them] both a favor" and "don't go there"; and warned that once he started he would not stop, "even if it requires the Samson Option."[1]

On July 8, 2021, Black posted the following tweet on Seven Arts' Twitter account (@SAPX_7arts):

- "When we're not telling 'George Sharp, failed stock promoter' to cease his slander to which he replies that he's gonna run to the authorities like a spineless bootlicker and report a non-crime, LOL, we're still on track to have $SAPX updates out shortly."  The tweet contained a link to an article titled, "George Sharp, failed stock promoter," by a blogger who offers insight on penny stocks.  The article included allegations from a complaint that Sharp and his company had been paid to promote stock in a company he later sued for fraudulent promoting activities.  The blogger suggested Sharp had improperly used two different limited liability companies for the promotion; urged readers, "[D]on't trust anyone, especially not in the penny stock world"; and

---

[1]     The "Samson Option" appears to be a reference to the biblical account of Samson's death after being captured by the Philistines.  "Samson said, 'Let me die with the Philistines!'  Then he pushed with all his might, and down came the temple on the rulers and all the people in it.  Thus he killed many more when he died than while he lived."  (Judges 16:30.)

stated that "anyone who held Sharp in high regard will be much less likely to do so now."

On July 9, 2021, Black posted three more tweets about Sharp on Seven Arts' Twitter account:

- "Good morning, except to George Sharp the fake crusader that lied to his . . . shareholders when he said there would be no toxic debt. George took on over $1mm in toxic all on 1/29/21. The only crusade he's on is blocking people from his twitter. #toxiccrusader." The tweet included images of past tweets from Sharp and images containing information about money Forwardly had raised in exchange for notes convertible to stock, including the loan dates and amounts, the names of the lenders, and the conversion prices.

- "Why did George Sharp take on over $1mm in toxic debt all on 1/29/21? Because George has a hobby that his diluted shareholders will pay for. On 2/8/21 George spent $585k on 2 horses. You can read about it here . . . . You can follow George's hobby @GSharpRacing." The tweet contained a link to a news report that 10 days after Forwardly had taken on the debt, Sharp bought two racehorses for $585,000.

- "We don't feel very 'exposed' yet by fraud grifter, George Sharp, but our new $SAPX website was apparently discovered yesterday by shareholders. It's still a work in progress with more info to be added as our business plan progresses."

C.    *Litigation*

On July 14, 2021, Sharp sued Seven Arts and Black for defamation and false light invasion of privacy. Sharp alleged the four tweets Black posted through Seven Arts' Twitter account on July 8 and 9, 2021, falsely stated he had defrauded shareholders of Forwardly by taking on "toxic debt" to buy

5

racehorses and thereby injured his reputation and cast him in a false light that a reasonable person would find offensive.

Two weeks later, Seven Arts responded with an anti-SLAPP motion against the entire complaint. (Code Civ. Proc., § 425.16, subd. (b)(1).)[2] Seven Arts argued it satisfied its burden under the first step of the anti-SLAPP analysis, because Sharp's claims were directed against speech on a public issue. Seven Arts argued Sharp could not meet his burden under the second step of the analysis to show a probability of prevailing on his claims, because: (1) Seven Arts had no respondeat superior liability for tweets that were posted by Black before he took over Seven Arts and were part of a personal dispute with Sharp; (2) the tweets were nonactionable opinions; and (3) the tweets concerned potential governmental action or private suit against Black and so were protected by the litigation privilege (Civ. Code, § 47, subd. (b)). Seven Arts requested no action on the claims against Black and stated he would contest personal jurisdiction and raise other claims and defenses if and when he was properly served. Seven Arts supported its motion with a declaration from Hoffman that described the formation of Seven Arts and its sale to Black and a declaration with attached exhibits from Black that

---

[2]    "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (Code Civ. Proc., § 425.16, subd. (b)(1).) Litigation of an anti-SLAPP motion involves two steps. First the defendant must show the challenged claim arises from activity protected by the statute, and then the burden shifts to the plaintiff to submit evidence that, if credited, would sustain a favorable judgment for the plaintiff. (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788 (*Monster Energy*); *Balla v. Hall* (2021) 59 Cal.App.5th 652, 671 (*Balla*).)

described, among other things, his reasons for posting the tweets critical of Sharp.[3]

Sharp opposed the anti-SLAPP motion. He argued Seven Arts had not met its burden on the first step to show the tweets concerned an issue of public interest. Sharp argued he met his burden on the second step to show a probability of prevailing on the merits because: (1) the tweets contained false statements of fact about him that injured his reputation and cast him in a false light; (2) the litigation privilege did not cover tweets that were not made in anticipation of litigation under serious consideration and were published to persons unconnected to any such litigation; and (3) Seven Arts was liable for tweets posted on its Twitter account by Black when he was its sole officer and director. Sharp requested $11,025 for attorney fees and costs. With the opposition, Sharp submitted a declaration stating he did not take on "toxic debt" for Forwardly and use the proceeds to buy himself racehorses. Sharp attached to his declaration printouts of the allegedly defamatory tweets and other documents. Sharp's attorney also submitted a declaration, which attached copies of the amended annual report for Seven Arts filed with the Wyoming Secretary of State on June 4, 2021, a June 14, 2021 press release from Seven Arts, and other documents.

---

[3] Black stated he posted the four tweets "as a preemptive defense against any claims or demands which [he] anticipated Sharp or Hamilton might make against [him] or [Seven Arts] arising out of the false connection between [Seven Arts] and Miller." Black "intended to establish that Sharp was not a reliable complainant." In his tweets referencing "toxic debt" and calling Sharp a "fraud grifter," Black "raised the reasonable suspicion of whether Sharp used the proceeds to acquire racehorses, a hobby of Sharp's." Black's "tweets were intended to express [his] opinion that Sharp would have criticized this behavior if conducted by another OTC company and hence was in no position to style himself as an exposer of fraud, as he has in other litigation."

In reply, Seven Arts repeated and expanded on points it had made in the initial motion papers, argued Sharp had waived or forfeited any opposition to its argument against respondeat superior liability, and asked for reasonable attorney fees.

The trial court held a hearing and granted Seven Arts' anti-SLAPP motion in part and denied it in part. The court ruled Seven Arts satisfied the first step because Sharp's claims arose out of statements that were made in "a public forum" (tweets on Twitter) and that concerned "an issue of public interest" (hypocritical practices of a prominent crusader against corporate fraud). (Code Civ. Proc., § 425.16, subd. (e)(3).) Turning to the second step, the court rejected Seven Arts' contentions that it had no respondeat superior liability for Black's tweets and that the litigation privilege covered the tweets. The trial court agreed with Seven Arts that two of the tweets (those calling Sharp a "failed stock promoter" and a "fraud grifter") were nonactionable opinions and struck the allegations concerning those tweets from Sharp's complaint, but it disagreed as to the other two tweets (those accusing Sharp of taking on "toxic debt" to buy racehorses) and refused to strike the allegations concerning them. The court denied Sharp's request for attorney fees and ruled Seven Arts' success in striking claims arising out of two of the tweets entitled it to attorney fees in an amount to be decided by a later motion.

Both parties appealed. (Code Civ. Proc., §§ 425.16, subd. (i), 904.1, subd. (a)(13) [order granting or denying anti-SLAPP motion is appealable]; *Old Republic Construction Program Group v. The Boccardo Law Firm, Inc.* (2014) 230 Cal.App.4th 859, 866, fn. 4 [order granting in part and denying in part anti-SLAPP motion is appealable].)

8

## II.

## DISCUSSION

A.    *Parties' Contentions*

Sharp initially raises an argument concerning the scope of the anti-SLAPP motion.  He contends that because Seven Arts moved to strike the entire complaint, it was inappropriate for the trial court to grant the motion in part and strike the allegations concerning two of the four related tweets.  Instead, says Sharp, the court should have denied the motion and declared him the prevailing party and awarded him attorney fees.  Seven Arts responds that it was the prevailing party on the motion because the trial court struck claims based on two of the tweets.

On the substance of the motion, the parties now agree the four tweets at issue constituted activity protected by the anti-SLAPP statute and Seven Arts satisfied its burden on the first step of the motion.  The parties dispute whether Sharp satisfied his burden on the second step to show a probability of prevailing in the litigation as to each of the tweets.  Sharp contends he satisfied his burden and the court should have denied the anti-SLAPP motion because all four tweets implied provably false facts.  He further contends the court correctly rejected Seven Arts' arguments on respondeat superior liability and the litigation privilege.  Countering Sharp's contentions, Seven Arts argues Sharp did not meet his burden and the trial court should have stricken the entire complaint, because Seven Arts has no respondeat superior liability for Black's posting of the tweets, all four tweets are nonactionable opinions, and the litigation privilege bars Sharp's complaint.

B.    *Standard of Review*

We review de novo an order granting or denying an anti-SLAPP motion.  (*Monster Energy*, *supra*, 7 Cal.5th at p. 788; *Balla*, *supra*, 59

9

Cal.App.5th at p. 671.)  When deciding whether the plaintiff has met the second-step burden of showing a probability of prevailing on the challenged claim (Code Civ. Proc., § 425.16, subd. (b)(1)), we proceed as we do when reviewing a ruling on a motion for summary judgment (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*); *Teamsters Local 2010 v. Regents of University of California* (2019) 40 Cal.App.5th 659, 665).  We consider the pleadings and determine whether the plaintiff's evidence, accepted as true, and the inferences reasonably drawn from that evidence suffice to sustain a judgment for the plaintiff.  (*Baral*, at p. 385; *Roche v. Hyde* (2020) 51 Cal.App.5th 757, 787 (*Roche*).)  We consider the defendant's evidence only to determine whether it defeats the challenged claim as a matter of law.  (*Baral*, at p. 385; *Balla*, at p. 671.)  Claims with at least minimal merit may proceed. (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009 (*Bonni*).)

C.     *Scope of Anti-SLAPP Motion*

We first address Sharp's contention the trial court erred by granting the motion in part because Seven Arts moved to strike the entire complaint.[4] Sharp relies on the following rule:  "If the plaintiff 'can show a probability of prevailing on *any part of its claim*, the cause of action is not meritless' and will not be stricken; 'once a plaintiff shows a probability of prevailing on any part of its claim, the plaintiff *has established* that its cause of action has some merit and the entire cause of action stands.' "  (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820 (*Oasis*), quoting *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 106 (*Mann*).)  He also relies on the following language by which a Court of Appeal defended its use of the "principal thrust or gravamen analysis" to determine whether a cause of

_____

[4]     We shall address Sharp's related contention concerning attorney fees in part II.E., *post*.

action arose from protected activity: "a special motion to strike, like a conventional motion to strike[,] may be used to attack an entire pleading, such as a complaint, and various subparts of a pleading, such as a cause of action or pleaded count, as well as component paragraphs, words or phrases. Critically, in this case, Defendants did not move to strike certain subparts of Plaintiffs' complaint. Instead, they expressly moved to strike Plaintiffs' entire complaint and all claims asserted against them." (*Optional Capital, Inc. v. Akin Gump Strauss, Hauer & Feld LLP* (2017) 18 Cal.App.5th 95, 111, fn. 5 (*Optional Capital*).)

We considered and rejected an argument similar to Sharp's in *Balla, supra*, 59 Cal.App.5th 652. There the plaintiffs filed separate complaints for defamation and false light invasion of privacy based on several publications by the defendant. (*Id.* at pp. 665-666.) The defendant filed an anti-SLAPP motion against each complaint " 'in its entirety.' " (*Id.* at p. 666.) The trial court ruled it had to deny the motions if any portion of the challenged complaints were actionable, found such portions, and denied the motions. (*Id.* at pp. 668-670.) On appeal, we agreed with the defendant's contention the trial court erred by concluding it had to deny the anti-SLAPP motions if any portion of the complaints were actionable. (*Id.* at p. 671.) We explained that in *Baral, supra*, 1 Cal.5th 376, the Supreme Court of California held an anti-SLAPP motion could reach separate claims within a single pleaded cause of action and disapproved the contrary rule from *Mann, supra*, 120 Cal.App.4th at page 106, that a court need not parse the cause of action and leave only those portions that have merit. (*Balla*, at p. 671.) We further explained that *Baral* limited *Oasis, supra*, 51 Cal.4th 811, to its facts—i.e., an anti-SLAPP motion attacking an entire complaint on a single ground as opposed to a motion attacking claims arising from discrete allegations of

11

wrongdoing—and confirmed that a plaintiff must make the required evidentiary showing as to each challenged claim based on allegations of protected activity. (*Balla*, at p. 672.) We noted *Optional Capital*, *supra*, 18 Cal.App.5th 95, was like *Oasis* in that a single legal theory (the litigation privilege) defeated the entire complaint. (*Balla*, at p. 672.) By contrast, in *Balla* the parties' briefing in the trial court addressed individual publications and elements. (*Ibid.*) Hence, the trial court was required to consider whether the plaintiff was likely to prevail as to each publication. (*Ibid.*)

The same is true here. Although the notice of the anti-SLAPP motion stated Seven Arts moved to strike "the Complaint" and did not refer to the individual tweets that allegedly defamed Sharp and cast him in a false light, whether the motion targeted the individual tweets "turns on how the issues are framed—not simply the text of the notice of motion." (*Balla*, *supra*, 59 Cal.App.5th at p. 672.) We acknowledge that as in *Oasis*, *supra*, 51 Cal.4th 811, and *Optional Capital*, *supra*, 18 Cal.App.5th 95, some of the legal theories Seven Arts asserted (no respondeat superior liability and litigation privilege) were directed to the entire complaint and did not target specific allegations within a cause of action. But Seven Arts, like the defendant in *Balla*, also attacked each publication on which Sharp's complaint was based. In its supporting memorandum of points and authorities, Seven Arts referred to the four tweets and the paragraphs of the complaint where they were alleged, and argued the tweets were all nonactionable opinions. In his opposition memorandum, Sharp discussed each tweet and explained why, in his view, each was defamatory and cast him in a false light. In its reply memorandum, Seven Arts argued none of the tweets stated a provably false fact. The parties' briefing in the trial court thus shows that Seven Arts was challenging each tweet on which Sharp based his causes of action for

defamation and false light invasion of privacy and that Sharp understood Seven Arts was doing so. The trial court therefore properly considered each tweet in deciding whether Sharp had met his burden on the second step of the anti-SLAPP motion.

We further note the trial court's approach is consistent with that prescribed by the Supreme Court of California in its most recent decision on point, *Bonni, supra*, 11 Cal.5th 995. There the Supreme Court stated: "Analysis of an anti-SLAPP motion is not confined to evaluating whether an entire cause of action, as pleaded by the plaintiff, arises from protected activity or has merit. Instead, courts should analyze each claim for relief— each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action—to determine whether the acts are protected and, if so, whether the claim they give rise to has the requisite degree of merit to survive the motion." (*Id.* at p. 1010.)

D.    *Sharp's Probability of Prevailing*

We next consider whether Sharp showed his causes of action for defamation and false light invasion of privacy had at least minimal merit as to each of the four tweets on which he based the causes of action. (*Bonni, supra*, 11 Cal.5th at p. 1009.) To prevail on the defamation count, Sharp must prove the publication of unprivileged false statements of fact that have a tendency to injure his reputation. (Civ. Code, §§ 44, 45; *Shively v. Bozanich* (2003) 31 Cal.4th 1230, 1242; *Mitchell v. Twin Galaxies, LLC* (2021) 70 Cal.App.5th 207, 218.) To prevail on the invasion of privacy count, he must prove the publication portrays him to the public in a manner that is false and highly offensive to a reasonable person. (*Fellows v. National Enquirer, Inc.*

13

(1986) 42 Cal.3d 234, 238; *Mitchell*, at p. 218.)[5]  Where, as here, "a false light claim is coupled with a defamation claim, the false light claim is essentially superfluous, and stands or falls on whether it meets the same requirements as the defamation cause of action." (*Eisenberg v. Alameda Newspapers, Inc.* (1999) 74 Cal.App.4th 1359, 1385, fn. 13; accord, *Mitchell*, at p. 218.)  We thus need and do examine only the elements of the defamation claim that are in dispute to determine whether Sharp met his burden to submit evidence that, if credited, would support a finding in his favor.  (*Baral, supra*, 1 Cal.5th at pp. 384-385; *Mitchell*, at pp. 217-218.)

   1.   *Publication*

Seven Arts argues it has no respondeat superior liability for the tweets posted by Black.  According to Seven Arts, the tweets concern a personal dispute between Black and Sharp, not any enterprise of Seven Arts; Black posted them before he had been appointed as an officer or director of Seven Arts; and Seven Arts did not later ratify the tweets.  Sharp responds that Seven Arts is liable because Black posted the tweets on Seven Arts' official Twitter account after a government filing and press release by Seven Arts stated Black had taken over the company, and also because Seven Arts later ratified the tweets by leaving them posted after Sharp filed this action and after Hoffman and Black executed the agreement retroactively transferring control of Seven Arts to Black.  As we shall explain, Seven Arts is potentially

---

[5]      When the plaintiff is a public figure, defamation and false light claims require proof of the additional element of malice, i.e., the defendant acted with knowledge the statement was false or with reckless disregard as to its falsity. (*Reader's Digest Assn. v. Superior Court* (1984) 37 Cal.3d 244, 256; *De Havilland v. FX Networks, LLC* (2018) 21 Cal.App.5th 845, 865.)  Seven Arts has not argued Sharp is a public figure.  The malice element is thus not an issue in this appeal.

liable for tweets Black posted as its president on its behalf, and we therefore need not and do not address the parties' competing arguments on ratification.

To be liable for a defamatory publication, the defendant must have taken a responsible part in the publication. (*Abir Cohen Treyzon Salo, LLP v. Lahiji* (2019) 40 Cal.App.5th 882, 889; *Osmond v. EWAP, Inc.* (1984) 153 Cal.App.3d 842, 852.) As a corporation, Seven Arts can act only through the agency of natural persons who have been put in charge of its business. (*Presbyterian Camp & Conference Centers, Inc. v. Superior Court* (2021) 12 Cal.5th 493, 515; *Lowe v. Yolo County etc. Water Co.* (1910) 157 Cal. 503, 512.) Because a "corporation can only act through individuals . . . it can only be liable for defamation derivatively." (*Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1347.) Derivative (or respondeat superior) liability attaches to defamatory publications of a corporate agent made within the scope of the agency and in furtherance of the business of the corporation. (*Sanborn v. Chronicle Pub. Co.* (1976) 18 Cal.3d 406, 411; *Alexander v. Community Hospital of Long Beach* (2020) 46 Cal.App.5th 238, 264.) It is undisputed that Black posted the allegedly defamatory tweets on Seven Arts' official Twitter account. The dispositive question is whether he was acting as an agent on behalf of Seven Arts when he posted them.[6]

---

6    Seven Arts' derivative liability for Black's acts is arguably a question of Wyoming law, because Seven Arts is incorporated in Wyoming and the law of the state of incorporation generally governs the internal relations of a corporation with its shareholders, directors, officers, and agents. (*Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1106, fn. 2; *State Farm Mutual Automobile Ins. Co. v. Superior Court* (2003) 114 Cal.App.4th 434, 442.) Neither party, however, invoked Wyoming law in the trial court, where they cited only California law on the derivative liability issue. The parties also rely largely on California law in this court. Seven Arts, however, does cite for the first time in its briefing here three Wyoming statutes as support for the contention that Black was not validly appointed as Seven Arts' CEO until after he had

15

The evidence submitted on the anti-SLAPP motion suffices to show Black was doing so. The amended annual report filed with the Wyoming Secretary of State on June 4, 2021, was signed by Black and states he replaced Hoffman as president of Seven Arts. A press release Seven Arts issued 10 days later states: "On June 4, 2021, by a majority shareholder vote, Jason Black was appointed as CEO of the Company." Although Black and Hoffman stated in their declarations that they did not execute the agreement by which Hoffman resigned from Seven Arts and Black took over until July 23, 2021, they both admitted the agreement was dated June 4, 2021. The parties to a contract may set its effective date earlier than the date of execution. (*Du Frene v. Kaiser Steel Corp.* (1964) 231 Cal.App.2d 452, 458; *Wright v. Prudential Ins. Co., etc.* (1938) 27 Cal.App.2d 195, 219; *Acton Rock Co. v. Lone Pine Co.* (1919) 44 Cal.App. 597, 601.) In the absence of evidence to the contrary (Seven Arts did not submit the agreement between Hoffman and Black), we must infer Hoffman and Black did so. (*Roche*, *supra*, 51 Cal.App.5th at p. 787 [on review of order on anti-SLAPP motion, appellate court must draw all legitimate inferences from evidence in favor of plaintiff].) Hence, the evidence showed Black had become president of Seven Arts more than one month before he posted the tweets critical of Sharp. Ordinarily the president of a corporation acts and speaks directly on its behalf in conducting its affairs, and the president's statements are legally binding on the corporation. (*Monteleone v. Southern California Vending Corp.* (1968) 264

---

posted the tweets critical of Sharp. "As the forum state, California will apply its own law 'unless a party litigant timely invokes the law of a foreign state.' " (*Chen v. Los Angeles Truck Centers, LLC* (2019) 7 Cal.5th 862, 867.) "A request made for the first time on appeal is untimely, and any objection to the choice of law is deemed waived." (*Danzig v. Jack Grynberg & Associates* (1984) 161 Cal.App.3d 1128, 1139.) We therefore decide the issue based on California law.

Cal.App.2d 798, 806; *Moore v. Phillips* (1959) 176 Cal.App.2d 702, 709; *Halbert v. Berlinger* (1954) 127 Cal.App.2d 6, 17; *Hoffman, Inc. v. Bernstein F. Prod.* (1919) 42 Cal.App. 12, 14-15.) Black admits he posted the tweets "as a preemptive defense against any claims or demands which [he] anticipated Sharp or Hamilton might make against [him] *or [Seven Arts] arising out of the false connection between [Seven Arts] and Miller*." (Italics added.) We thus conclude Black was acting in his capacity as Seven Arts' president and in furtherance of its business interests when he posted the tweets, and Seven Arts is potentially liable for them.

      2.    *Privilege*

Seven Arts contends the tweets are protected by the litigation privilege because Black posted them in the reasonable belief Hamilton or Sharp would instigate regulatory action or litigation against him or Seven Arts based on the false report that Miller, who had been charged with securities fraud, was involved in Black's efforts to revive Seven Arts. Sharp responds the privilege does not apply because no litigation was under serious consideration when Black posted the tweets, the tweets were not made to achieve the objects of any such litigation, and they were published to persons unconnected to any such litigation. We agree with Sharp's last point, which Seven Arts has not addressed, and therefore need not and do not discuss the other two.

The litigation privilege, codified at Civil Code section 47, subdivision (b), provides that a "publication or broadcast" made in a "judicial proceeding" is privileged. The privilege extends to a judicial or quasi-judicial proceeding that is pending or is contemplated in good faith and under serious consideration, and bars imposition of tort liability on a party or other authorized participant for any communication logically related to the proceeding and made to achieve its objects. (*Action Apartment Assn., Inc. v.*

17

*City of Santa Monica* (2007) 41 Cal.4th 1232, 1241, 1251; *Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1057.) Communications to nonparticipants or to persons with no substantial interest in or connection to the proceeding are not privileged under Civil Code section 47, subdivision (b). (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 219; *Argentieri v. Zuckerberg* (2017) 8 Cal.App.5th 768, 784; *Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1141 (*Rothman*); *Susan A. v. County of Sonoma* (1991) 2 Cal.App.4th 88, 93.)

The communications at issue here are the four tweets Black posted on Seven Arts' Twitter account "as a preemptive defense against any claims or demands which [he] anticipated Sharp or Hamilton might make against [him] or [Seven Arts] arising out of the false connection between [Seven Arts] and Miller," and by which Black "intended to establish that Sharp was not a reliable complainant." The copies of the tweets Sharp submitted in opposition to the anti-SLAPP motion show each was viewed and forwarded multiple times, and two of the tweets included replies from other Twitter users. The copy of Seven Arts' Twitter home page states Seven Arts has 470 followers. The litigation privilege does not shield the publication of tweets about Sharp's alleged lack of reliability as a complainant in matters concerning OTC-listed companies to penny stock market followers who would have no substantial interest in or connection to potential litigation by Sharp against Black or Seven Arts. (See *GetFugu, Inc. v. Patton Boggs LLP* (2013) 220 Cal.App.4th 141, 154 [defendants' publication of tweet alleging misdeeds of plaintiffs to " 'investment community' " not privileged]; *Financial Corp. of America v. Wilburn* (1987) 189 Cal.App.3d 764, 778 [defendant's accusations of crimes by plaintiffs to " 'persons throughout Northern California' " not privileged].)

18

We also note that applying the litigation privilege to the disparaging tweets Black posted about Sharp on Seven Arts' Twitter account would undermine the purpose of the litigation privilege. "The litigation privilege exists so that persons who have been harmed or have other grievances calling for redress through the judicial processes can and will use the courts, rather than self-help, to obtain relief. The privilege thus affords its extraordinary protection to the uninhibited airing, discussion and resolution of disputes *in, and only in, judicial or quasi-judicial arenas*. Public mudslinging, while a less physically destructive form of self-help than a public brawl, is nevertheless one of the kinds of unregulated and harmful feuding that courts and their processes exist to prevent. It would be counterproductive to afford to it the same protections which [Civil Code] section 47, subdivision (b) gives to court processes." (*Rothman, supra*, 49 Cal.App.4th at p. 1146.)

3.    *Fact Versus Opinion*

Seven Arts argues the four tweets state only negative opinions of Sharp using fiery rhetoric and hyperbole and thus cannot support liability for defamation as a matter of law. Sharp argues the tweets are actionable because they imply false statements of fact. We agree with Sharp.

Only a false statement of fact can be the basis of a defamation claim. (Civ. Code, §§ 45 [libel], 46 [slander]; *Bikkina v. Mahadevan* (2015) 241 Cal.App.4th 70, 86.) An opinion, even if published in bad faith, cannot support such a claim. (*Campanelli v. Regents of University of California* (1996) 44 Cal.App.4th 572, 578.) An opinion that implies a provably false statement of fact, however, can constitute actionable defamation. (*Balla, supra*, 59 Cal.App.5th at p. 677; *Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1370 (*Wong*).) If the gist of the publication implies a false assertion of fact that tends to injure the plaintiff's reputation, the publication, even though

19

cast in the form of an opinion, is actionable. (*Balla*, at pp. 677-678; *McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 112 (*McGarry*).) Whether an allegedly defamatory publication is a fact or an opinion is a question of law. (*Gregory v. McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 601.) To distinguish actionable assertions of fact from nonactionable opinions, courts consider the totality of the circumstances, including the language and other content of the publication as a whole, the context in which the publication was made, and the audience to which it was directed. (*Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 260-261 (*Baker*); *Gregory*, at p. 601; *Bently Reserve LP v. Papaliolios* (2013) 218 Cal.App.4th 418, 427 (*Bently Reserve*).)

We begin with the shared context of the publications and the audience to which they were directed. The four tweets at issue were posted on Seven Arts' official Twitter account. Regular readers of postings on Twitter and other social media would know users often " 'play fast and loose with facts' " (*Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 696 (*Summit Bank*)) and "online discussions may look more like a vehicle for emotional catharsis than a forum for the rapid exchange of information and ideas" (*Krinsky v. Doe 6* (2008) 159 Cal.App.4th 1154, 1163 (*Krinsky*)). Not all online commentary is nonactionable opinion, however; it can be actionable if it states or implies false and defamatory facts. (*Balla, supra*, 59 Cal.App.5th at p. 682; *Sanders v. Walsh* (2013) 219 Cal.App.4th 855, 865 (*Sanders*).) Thus, although postings that are "true rants and raves" should not be taken as asserting provable facts, postings that are serious in content and tone and contain specific details about alleged conduct from a source with apparent knowledge reasonably may be perceived as asserting facts. (*Bently Reserve, supra*, 218 Cal.App.4th at p. 431.) The target audience for the tweets Black posted

about Sharp would be followers and other viewers of Seven Arts' Twitter account, who we presume are individuals generally familiar with the OTC market and interested in companies and players in the market. That audience reasonably could conclude that tweets from an OTC-listed company (Seven Arts) concerning specific wrongdoing (fraudulent stock promotion and embezzling corporate funds) by a "longtime whistleblower" and "[w]ell-known exposer of OTC fraud" (Sharp) contained at least some factual information.

The audience likely would draw the conclusion the tweets contained factual information when "the facts surrounding the publication [of the tweets] [are] also . . . carefully considered." (*Baker*, *supra*, 42 Cal.3d at p. 261.) The tweets were part of a larger exchange between Sharp and Black, who are rivals in the penny stock market. After Sharp and some of his Twitter followers posted tweets falsely stating Miller was involved with Black in the revival of Seven Arts and derisively laughing at the suggestion Black is "a very capable leader," Black sent Sharp an e-mail the same day accusing him of "living in a glass house" and warning him to stay out of Black's "neck of the woods" or else Black would expose Sharp's "pump and dumps extortion racket days." Over the next two days, Black followed up with four tweets accusing Sharp of making false claims to authorities and misappropriating corporate funds. By posting the tweets, Black "intended to establish that Sharp was not a reliable complainant" and "was in no position to style himself as an exposer of fraud." (See fn. 3, *ante*.) In other words, Black intended to discredit Sharp by posting tweets insinuating he engages in the very type of OTC fraud against which he purports to fight. Thus, when the tweets are " ' "read as a whole in order to understand [their] import and the effect which [they were] calculated to have on the reader [citations], and

21

construed in the light of the whole scope and apparent object of the writer" ' "
(*Baker*, at p. 261), they imply factual assertions about Sharp.

We next consider the language of the publications. The second and third tweets, which reference the "toxic debt" Forwardly allegedly assumed on January 29, 2021, and were sent within five minutes of each other, were clearly intended to be read together and to convey factual information. We acknowledge the tweets have some features typical of opinions, such as name-calling (e.g., "#toxiccrusader"), figurative language ("crusade"), and informality (e.g., calling Sharp by his first name and using contractions). (*ZL Technologies, Inc. v. Does 1–7* (2017) 13 Cal.App.5th 603, 624, 626 (*ZL Technologies*) [identifying features of opinions]; *Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394, 1401 (*Ferlauto*) [same].) But features typical of factual assertions predominate. The tweets are serious in tone and subject matter, stating that Sharp "lied to [Forwardly] shareholders" and "diluted" their stock by taking on more than $1 million in "toxic debt" to support his "hobby" of buying racehorses. (*Bently Reserve, supra*, 218 Cal.App.4th at p. 431 [serious tone and content indicate factual assertion].) And, importantly, these assertions were accompanied by factual backup. The earlier tweet included images of past tweets from Sharp, along with images of detailed information about the convertible loans Forwardly made on January 29, 2021, and the conversion price, and the later tweet linked to a news report of Sharp's purchase of two racehorses for $585,000 on February 8, 2021. (*Ibid.* [specificity as to conduct, date, and place indicates factual assertion].) A reasonable reader of the two tweets could conclude Seven Arts was implying Sharp had embezzled corporate funds, an implication tending to injure his reputation that can be proved true or false and thus is actionable. (Civ. Code, § 45; *Balla, supra*, 59 Cal.App.5th at pp. 677-678.)

The tweet calling Sharp a "fraud grifter" was posted on the same day as the two tweets just discussed and is of a piece with them. Although the tweet primarily concerns the status of Seven Arts' website, the tweet also states Seven Arts does not "feel very 'exposed' yet by fraud grifter, George Sharp." Considered by itself, the statement appears to be "juvenile name-calling [that] cannot reasonably be read as stating actual facts" (*Krinsky, supra*, 159 Cal.App.4th at p. 1176), or a mere "expression of contempt, too loose and figurative to be susceptible of being proved true or false" (*Ferlauto, supra*, 74 Cal.App.4th at p. 1403). The statement cannot be considered in isolation, however, and must be considered within the larger context of which it is a part. (*Baker, supra*, 42 Cal.3d at p. 261; *Balla, supra*, 59 Cal.App.5th at p. 678.) The tweet followed two from earlier in the day that implied Sharp had misappropriated corporate funds to buy racehorses for himself and was intended to refer to those tweets. Black stated in his declaration that he called Sharp a "fraud grifter" based on the "undisputed facts" that Sharp had taken on "toxic debt" for Forwardly to the detriment of existing shareholders and soon thereafter bought two racehorses.[7] The phrase "fraud grifter" thus was used in reference to the specific wrongdoing described in the two immediately preceding tweets about Sharp and reasonably could be taken as

---

[7] The allegations about "toxic debt" were in fact disputed. In his declaration, Sharp admitted Forwardly raised $1.45 million by issuing notes convertible to stock, but he denied conversion would have a "toxic" effect on the stock price. On review of the trial court's order on Seven Arts' anti-SLAPP motion, we must accept Sharp's evidence as true. (*Baral, supra*, 1 Cal.5th at p. 385.) In any event, the toxicity of the debt does not determine whether the tweets are actionable statements of fact or nonactionable opinions. As explained in the text, the tweets are actionable because they imply the provably false and reputation-harming fact that Sharp misappropriated a portion of the funds Forwardly had raised to buy himself two racehorses.

23

a factual assertion that he personally and dishonestly profited (i.e., he is a "grifter") by deceiving Forwardly shareholders (i.e., by "fraud"). (See *Balla*, at pp. 681-682 [calling plaintiff " 'a fraud' " is actionable assertion of fact when made in reference to specific wrongdoing]; *Carver v. Bonds* (2005) 135 Cal.App.4th 328, 347 [" 'liar' epithet" could be defamatory if "taken to refer to something dishonorable that transpired in the business or professional dealings" at issue].) Further, by quoting the word *exposed* in the sentence calling Sharp a "fraud grifter," Black obviously intended to draw attention to Sharp's reputation as a "[w]ell-known exposer of OTC fraud." Hence, a reasonable reader of the tweet could take it to imply actionable assertions of fact damaging to Sharp's professional reputation. (Civ. Code, § 45; *Balla*, at pp. 677-678.)

That leaves the first tweet in the series. It was posted the day before the other three and called Sharp a " 'failed stock promoter.' " Like the other tweets, this one has features typical of nonactionable opinions, such as childish name-calling ("spineless bootlicker") and informality (use of contractions and the acronym "LOL"). (*ZL Technologies*, *supra*, 13 Cal.App.5th at p. 624.) It also has features typical of factual assertions. The tweet levels a serious charge ("slander") against Sharp for making false reports to government officials ("he's gonna run to the authorities . . . and report a non-crime"). (*Bently Reserve*, *supra*, 218 Cal.App.4th at p. 431 [serious content indicates factual assertion].) Although the tweet itself provides no factual details, it includes a link to a blogger's article titled, "George Sharp, failed stock promoter," which quotes from and links to a complaint in which Sharp admitted he had been paid to promote stock in a company he later sued for fraudulent promoting activities. The article also states Sharp used two different limited liability companies for his stock

24

promotion business, for which the blogger could "think of no legitimate reason." Based on this duplicity, the blogger urged readers not to trust Sharp. Such specific information from a source apparently knowledgeable about the penny stock market is more characteristic of a factual assertion than an opinion. (*Ibid.*) A reasonable reader of the tweet who followed the links could conclude Seven Arts was impliedly asserting that Sharp had engaged in fraudulent promotion of penny stocks and sham litigation and therefore is not, as he claims, a legitimate "whistleblower" and "exposer of OTC fraud." That is the very conclusion Black wanted his readers to draw, for he posted the tweet "to establish that Sharp was not a reliable complainant." Because the factual premises for implication about Sharp can be proved true or false and the implication tends to injure him in his professional reputation, it can support a defamation claim. (Civ. Code, § 45; *Bently Reserve*, at p. 426.)

In sum, when "the language of the [tweets] is examined" and "the context in which [they were posted] [is] considered" (*Baker*, *supra*, 42 Cal.3d at pp. 260-261), we perceive the clear implication of the tweets to be that Sharp is not to be trusted as a whistleblower on OTC fraud because he fraudulently promoted stock in the past and recently defrauded Forwardly shareholders by taking on corporate debt to buy racehorses for himself. Because the tweets imply provably false facts injurious to Sharp's professional reputation in the penny stock market, they are actionable assertions of fact, not nonactionable opinions. (Civ. Code, § 45; *Wong, supra*, 189 Cal.App.4th at pp. 1369-1370.)

Seven Arts advances two arguments in urging us to reach the opposite conclusion. Neither is persuasive.

25

Seven Arts first argues all four tweets are not defamatory statements of fact, and are nothing more than " 'fiery rhetoric,' " " 'hyperbole,' " " 'exaggerated criticism,' " and " 'counterpunching' " of a type to be expected in an " 'adversarial setting' " on the Internet. Courts have recognized that statements posted on Twitter and other Internet fora often are part of a "debate or criticism that has become heated and caustic." (*Krinsky*, *supra*, 159 Cal.App.4th at p. 1174.) Readers thus "should be predisposed to view them with a certain amount of skepticism, and with an understanding that they will likely present one-sided viewpoints rather than assertions of provable facts." (*Summit Bank*, *supra*, 206 Cal.App.4th at p. 696.) But, "this should not be taken to mean online commentators are immune from defamation liability" or "online commentary is pure opinion per se." (*Sanders*, *supra*, 219 Cal.App.4th at pp. 864-865; see *Bently Reserve*, *supra*, 218 Cal.App.4th at p. 429 ["the mere fact speech is broadcast across the Internet by an anonymous speaker does not ipso facto make it nonactionable opinion and immune from defamation law"].) As we have held, "online speech can still be defamatory." (*Balla*, *supra*, 59 Cal.App.5th at p. 682.) Simply couching statements in terms of opinion does not dispel their defamatory implications. (*McGarry*, *supra*, 154 Cal.App.4th at p. 112.) Rather, as we have explained above, online commentary *is* defamatory where, as here, it includes strongly worded negative opinions about the plaintiff that also imply provably false assertions of fact tending to injure the plaintiff's reputation.

Seven Arts next focuses on the two tweets referencing "toxic debt" and argues they are not defamatory. It points out that Sharp admits he acquired two new horses shortly after Forwardly sold the promissory notes convertible to stock, and the tweets do not "assert as a fact" that he used the proceeds to buy the horses and "specifically [do] not claim" he violated any law,

26

regulation, or ethical standard applicable to penny stock promoters.  Instead, says Seven Arts, the tweets merely express the "opinion that the confluence of the two events, the sale of convertible notes and the purchase of the two horses, creates an 'odor' of possible conflicts of interest."  We disagree.  A defendant is liable for what is insinuated as well as for what is stated explicitly.  (*Bates v. Campbell* (1931) 213 Cal. 438, 442; accord, *Wong, supra*, 189 Cal.App.4th at p. 1372.)  If the defendant juxtaposes a series of facts in a way that implies a defamatory connection among them, the defendant may be held liable for the defamatory implication even though the facts are true.  (*Weller v. American Broadcasting Companies, Inc.* (1991) 232 Cal.App.3d 991, 1003, fn. 10.)  This rule applies here.  As we explained above, the tweets referencing "toxic debt," when read together, clearly imply Sharp defrauded Forwardly shareholders by misappropriating corporate funds to buy racehorses for himself.  One of the tweets juxtaposes the pertinent facts in three successive sentences to create the defamatory implication:  "Why did George Sharp take on over $1mm in toxic debt all on 1/29/21?  Because George has a hobby that his diluted shareholders will pay for.  On 2/8/21 George spent $585k on 2 horses."  Use of the word *because* suggests a causal link between the assumption of debt and the purchase of racehorses.  Accusing Sharp of the crime of embezzlement (Pen. Code, §§ 503, 504) in this way is defamatory.  (Civ. Code, § 45; *Balla, supra*, 59 Cal.App.5th at pp. 680, 686; *Burrill v. Nair* (2013) 217 Cal.App.4th 357, 383.)

E.     *Attorney Fees*

The last issue for decision is the parties' entitlement to attorney fees.  If a court grants an anti-SLAPP motion in whole or in part, the defendant is entitled to recover attorney fees.  (Code Civ. Proc., § 425.16, subd. (c)(1); *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.*

27

(2005) 129 Cal.App.4th 1228, 1267.) If the court denies the motion, the plaintiff is entitled to attorney fees only if the court finds the motion "is frivolous or is solely intended to cause unnecessary delay." (Code Civ. Proc., § 425.16, subd. (c)(1); see *Dowling v. Zimmerman* (2001) 85 Cal.App.4th 1400, 1432.) Neither party is entitled to recover attorney fees in this case.

Seven Arts is not entitled to fees because we are reversing the portion of the trial court's order that granted the anti-SLAPP motion and directing the court to deny the motion in its entirety. The portion of the order declaring Seven Arts entitled to fees also must be reversed. (*Graffiti Protective Coatings, Inc. v. City of Pico Rivera* (2010) 181 Cal.App.4th 1207, 1225.)

Sharp is not entitled to attorney fees because he has neither made nor attempted to make the required showing that the anti-SLAPP motion was frivolous or intended to cause unnecessary delay. In the opposition to the motion, he simply called the motion "frivolous" and asked the trial court to award him $11,025 in fees and costs, but made no argument as to why such an award would be proper. In this court, Sharp merely complains it was not "appropriate" for the trial court to deny his request for fees when Seven Arts did not obtain an order striking the entire complaint and asks us to order the trial court to grant his request. Never has Sharp offered any cogent argument with citations to legal authority in support of his request for attorney fees. Contentions supported by neither argument nor citation of authority are deemed to be without foundation and to have been abandoned. (*Bradley v. Butchart* (1933) 217 Cal. 731, 747; *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 162.)

28

## III.

## DISPOSITION

The order on the anti-SLAPP motion is affirmed in part and reversed in part. The matter is remanded to the trial court with directions to vacate the order and to enter a new order denying the motion in its entirety and denying Sharp's request for attorney fees and costs. The parties shall bear their own costs on appeal.

IRION, Acting P. J.

WE CONCUR:

DATO, J.

BUCHANAN, J.

29